# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Illinois Tool Works, Inc. v. Commerce & Industry Insurance Co.*, 2011 IL App (1st) 093084

---

| | |
|---|---|
| Appellate Court Caption | ILLINOIS TOOL WORKS, INC., Plaintiff-Appellant, v. COMMERCE AND INDUSTRY INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY, Defendants-Appellees (United National Insurance Company, Defendant). |
| District & No. | First District, First Division<br>Docket No. 1-09-3084 |
| Opinion filed | August 16, 2011 |
| Opinion withdrawn | September 16, 2011 |
| Rehearing denied | November 23, 1011 |
| Opinion filed | December 12, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court erred in granting judgment on the pleadings to defendant insurers in a declaratory judgment action brought by the insured's assignee seeking a determination that defendants had a duty to defend plaintiff in an underlying action against plaintiff and the insured for the contamination of the commercial property the insured initially leased for its business, which was later sold to plaintiff along with an assignment of the lease, since plaintiff showed that it was assigned the insured's rights to a defense under the policies issued by defendants, the assignment was valid, no consent was required and the facts alleged were within the coverage, and, therefore, the order granting judgment on the pleadings for defendants was reversed and the trial court was ordered to grant judgment on the pleadings for plaintiff. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CH-09619; the Hon. Kathleen M. Pantle, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Winston & Strawn LLP, of Chicago (Robin R. Lunn, Doressia L. Hutton, and Mohammed G. Ahmed, of counsel), for appellant.<br><br>Clausen Miller, PC, of Chicago (Margaret J. Orbon, Ilene M. Korey, and Don R. Sampen, of counsel), for appellee Commerce and Industry Insurance Company.<br><br>Merlo Kanofsky & Gregg, Ltd., of Chicago (Michael R. Gregg, Ross D. Roloff, Thomas D. Donofrio, and Danita L. Davis, of counsel), for appellee United States Fire Insurance Company. |
| Panel | JUSTICE KARNEZIS delivered the judgment of the court, with opinion.<br>Justices Cunningham and Harris concurred in the judgment and opinion. |

## OPINION

¶ 1 Plaintiff Illinois Tool Works filed an action against defendants Commerce and Industry Insurance Company (C&I) and United States Fire Insurance Company (USF) seeking a declaration that defendants had a duty to defend plaintiff in an underlying lawsuit and to reimburse plaintiff for its defense costs in that suit. The court granted judgment on the pleadings to defendants. Plaintiff argues on appeal the court erred in finding defendants had no duty to defend plaintiff in the underlying action because (1) plaintiff was assigned the benefits of insurance policies issued by defendants; (2) the underlying lawsuit had sought to impose liability on plaintiff as successor to the corporation which was the insured under the policies; (3) plaintiff was a putative insured under the policies because the underlying complaint alleged plaintiff was the successor to the insured under the policies; (4) the court relied on documents that were not part of the pleadings; and (5) the court considered new and contradictory facts raised in defendants' motions for judgment on the pleadings. We reverse and remand.

¶ 2                                          Background

¶ 3        Bruno Enssle owned a building and property (collectively the property) in Boulder, Colorado. In 1959, Binks Manufacturing Company began leasing the property from Enssle. In 1963, Binks R&D, a wholly owned subsidiary of Binks Manufacturing, began leasing and occupying the property. Binks R&D designed and manufactured electrostatic coating application equipment and related industrial products. In 1979, Frieda E. Enssle, Burke E. Enssle and Heidi Enssle Wilson (the Enssles) became the owners of the property. They continued leasing the property to Binks R&D.

¶ 4        Binks Manufacturing subsequently changed its name to Binks Sames Corporation then to Sames Corporation (collectively referred to as Binks). In 1998, plaintiff entered into an agreement with Binks for the purchase and sale of assets and stock relating to Binks' electrostatic coating application equipment and related products business. With the Enssles' consent, Binks R&D assigned the lease for the property to Binks and Binks assigned it to plaintiff. Binks R&D dissolved in 1999 and its remaining assets were distributed. In 2001, Binks filed for chapter 7 bankruptcy in federal court in Illinois. Plaintiff continued to lease and use the Enssles' property until 2003.

¶ 5        In 2003, the Enssles filed suit against plaintiff, Binks, Binks R&D and assorted former Binks officers in the United States District Court in Colorado (Enssle action or lawsuit).[1] They sought a judgment of joint and several liability against the defendants, whom they referred to as "tenant(s)," for their alleged environmental contamination of the property and refusal to clean it up. They asserted a myriad of claims, including breach of contract, negligence and violation of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9607(a) (2006)) (CERCLA). They requested common law and statutory damages, reimbursement and assorted other relief.

¶ 6        The Enssles alleged that Binks' and plaintiff's business activities throughout their tenancy on the property caused the release of hazardous materials into the building and environment, including soils and groundwater. The Enssles alleged that, in anticipation of the termination of the lease and in preparation for the Enssles' sale of the property, plaintiff informed them in 2002 that it would fix the environmental problems at the property prior to expiration of the lease on July 31, 2003. The Enssles hired a consultant to perform a limited environmental investigation of the property.

¶ 7        The consultant found that, in 1987, Binks had notified the Colorado Department of Public Health and Environment (CDPHE) that Binks was generating various hazardous waste solvents.[2] He found that, in 1990, the CDPHE had issued an inspection report identifying

_____

[1]The bankruptcy court modified the automatic stay imposed in Binks' bankruptcy case in order to allow the Enssles to file their action against Binks.

[2]The Enssles' complaint states that "tenant" notified the CDPHE and the CDPHE found the "tenants" improperly disposed of the hazardous wastes and that "tenant" performed an evaluation. Given that this is alleged to have occurred in from 1987 to 1990 and shortly thereafter and that plaintiff did not purchase the business until 1998, the tenant must necessarily have been Binks and/or

-3-

numerous environmental contamination violations by Binks, including improper storage and disposal of hazardous wastes without a permit and soil contamination emanating from the outdoor storage area. After the CDPHE report, Binks had an evaluation done of the groundwater at the property. The evaluation showed hazardous wastes were in the ground water and had migrated to the property boundary. Binks proposed a remediation plan for the contaminated soil and ground water to the CDPHE. The CDPHE required Binks to implement the plan but Binks did not perform any of the cleanup. The Enssles alleged Binks continued contaminating the soil and groundwater and allowing the passive migration of the illegally disposed hazardous wastes after the CDPHE's order.

¶ 8    Inspecting the inside of the building in 2002, the Enssles' consultant found assorted areas contaminated by hazardous substances. The Enssles alleged they required Binks and plaintiff to investigate the extent of the environmental contamination but they refused. The Enssles asserted that, in violation of the lease, plaintiff told them it would not perform investigation and cleanup and would not allow them access to the interior of the premises.

¶ 9    The Enssles alleged that, after plaintiff purchased Binks R&D in 1998, plaintiff substantially continued the Binks company with the same name, same operation, same products, same customers and same lease and held itself out to be a continuation of Binks. They contended that plaintiff was assigned the lease by Binks and, by that assignment, assumed and agreed to discharge all of Binks' obligations under the lease from and after the date of its purchase of Binks R&D. The lease requires, in part, that tenants indemnify the Enssles and hold them harmless from and against all obligations or liabilities arising from any violation of the law arising from the tenants' conduct; surrender the property at the end of the lease in good condition except for reasonable wear and tear; maintain and repair the property; and not commit waste. The Enssles claimed plaintiff refused to investigate the extent of the environmental contamination of the property and to clean up the contamination in violation of the lease and CERCLA. Plaintiff filed a cross-claim against Binks for indemnification.[3]

¶ 10    Defendants had each issued liability insurance policies to Binks. C&I's policies covered the period from December 1976 to December 1981. USF's policies covered from December 1981 to December 1984. Defendants defended Binks in the Enssle action. They refused to defend plaintiff in the Enssle action. The Enssle case and plaintiff's cross-claim against Binks were ultimately settled.

¶ 11    In May 2006, plaintiff filed a declaratory judgment action in the circuit court of Cook County against defendants.[4] Plaintiff sought a declaration that defendants had (a) owed it a duty to defend in the Enssle action because it was an insured under the policies defendants

Binks R&D. We therefore refer to the "tenant/tenants" as Binks.

[3]The bankruptcy court temporarily lifted the stay in Binks' bankruptcy action in order to allow plaintiff to file the cross-claim in the Enssle case in Colorado.

[4]Plaintiff also named United National Insurance Company as a defendant. The court dismissed it from the suit after it settled with plaintiff and it is not a party here.

had issued to Binks and (b) breached their insurance policies by refusing to defend plaintiff. It asserted it was an insured because it was a successor to Binks R&D and/or it had been assigned the benefits of the policies under its purchase agreement for Binks R&D. Plaintiff requested, in part, reimbursement for all defense costs it expended in the Enssle action and damages for defendants' breach of their duties to defend plaintiff under the policies.

¶ 12    On the parties' cross-motions for judgment on the pleadings pursuant to section 2-615(e) of the Illinois Code of Civil Procedure (735 ILCS 5/2-615(e) (West 2008)) (the Code), the court granted defendants' motion and denied plaintiff's motion. The court found defendants had no duty to defend plaintiff in the Enssle case, holding that the benefits of a defense had not been assigned to plaintiff in 1998 and plaintiff was, by its own admission in the underlying Enssle action, not a corporate successor to Binks. Plaintiff timely appealed.

¶ 13                                    Analysis

¶ 14                              Standard of Review

¶ 15    Plaintiff argues the court erred in granting defendants' motion for judgment on the pleadings based on its finding defendants had no duty to defend plaintiff against the Enssle complaint. "Any party may seasonably move for judgment on the pleadings" pursuant to section 2-615(e) of the Code. 735 ILCS 5/2-615(e) (West 2008). Judgment on the pleadings is proper when the pleadings disclose no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005); *Intersport, Inc. v. National Collegiate Athletic Ass'n*, 381 Ill. App. 3d 312, 318 (2008). It is similar to a motion for summary judgment but is limited to the pleadings. *Gillen*, 215 Ill. 2d at 385; *Intersport, Inc.*, 381 Ill. App. 3d at 318.

¶ 16    In ruling on a motion for judgment on the pleadings, the court must consider only those facts apparent from the face of the pleadings, judicial admissions in the record and matters subject to judicial notice. *Gillen*, 215 Ill. 2d at 385. A party moving for a section 2-615(e) judgment on the pleadings concedes the truth of the well-pled facts in the respondent's pleadings. *McCall v. Devine*, 334 Ill. App. 3d 192, 198 (2002). The court must take as true all reasonable inferences from those facts but construe the evidence strictly against the movant and disregard any conclusory allegations and surplusage. *McCall*, 334 Ill. App. 3d at 198; *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005). We review a court's order granting or denying a motion for judgment on the pleadings *de novo. McCall*, 334 Ill. App. 3d at 198.

¶ 17    Plaintiff argues the court erred in finding no duty to defend and granting judgment on the pleadings to defendants on that basis because (1) the purchase agreement expressly assigned to plaintiff all of Binks' rights to a defense for lawsuits such as the Enssle lawsuit and the insurance coverage claim for the Enssle lawsuit; (2) the Enssle suit sought to hold plaintiff liable as a successor to Binks R&D and, plaintiff having purchased substantially all of Binks R&D's assets, it was a successor to Binks' rights under the liability insurance policies; (3) plaintiff was a putative insured under the liability insurance policies; (4) the court improperly relied on documents that were not part of the pleadings; and (5) the court improperly considered new and contradictory facts raised in defendants' motions for judgment on the

-5-

pleadings.

¶ 18    An insurer's duty to defend arises if the facts alleged in the underlying complaint fall within or potentially within an insurance policy's coverage. *Allstate Insurance Co. v. Lane*, 345 Ill. App. 3d 547, 550 (2003). To determine whether a duty to defend exists, a court must compare the allegations of the underlying complaint with the relevant coverage provisions of the insurance policy. *Allstate Insurance Co.*, 345 Ill. App. 3d at 550. There is little question that the Enssle complaint triggered defendants' duty to defend Binks, if Binks requested such a defense. Binks was defendants' insured under the policies and the policies covered the period for which Binks was being sued. The question is whether the complaint triggered a duty to defend plaintiff, which was not a named insured on the policies.

¶ 19                                    Assignment Clause

¶ 20    Plaintiff first argues that defendants had a duty to defend it or reimburse its defense costs against the Enssle lawsuit because it had been assigned the benefits of the insurance policies in section 1.2.9 of its purchase agreement with Binks. Contract interpretation is a question of law, which we review *de novo*. *Marx Transport, Inc. v. Air Express International Corp.*, 379 Ill. App. 3d 849, 854 (2008). In that vein, assignments are governed by contract law and, therefore, reviewed *de novo*. *Cincinnati Insurance Co. v. American Hardware Manufacturers Ass'n*, 387 Ill. App. 3d 85, 99 (2008). An assignment happens when some identifiable interest is transferred from the assignor to the assignee. *Cincinnati Insurance Co.*, 387 Ill. App. 3d at 100. All that is needed is a document showing the intent of the assignor to vest ownership in the assignee of " 'the whole or a part of some particular thing, debt, or chose in action' " that is described with " 'sufficient particularity to render it capable of contract,' " to the assignee. *Cincinnati Insurance Co.*, 387 Ill. App. 3d at 100 (quoting *Klehm v. Grecian Chalet, Ltd.*, 164 Ill. App. 3d 610, 616 (1987)). "[T]he present transfer of rights that are not yet due or may never become due is effective if it appears that there is an existing contract out of which the debt may arise." *Loyola University Medical Center v. Med Care HMO*, 180 Ill. App. 3d 471, 479 (1989) (citing Walter Jaeger, 3 Williston on Contracts § 413, at 55 (3d ed. 1960)). As with all contracts, a valid assignment requires proof of intent to make the assignment and manifestation of that intent and the assignor must have " 'either actually or potentially the thing he attempts to assign.' " *Cincinnati Insurance Co.*, 387 Ill. App. 3d at 100 (quoting *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 350 (2000)). The assignee receives all the assignor's right, title or interest in the thing assigned and can claim no greater right or interest than the assignor possessed. *Cincinnati Insurance Co.*, 387 Ill. App. 3d at 100.

¶ 21    Under section 1.2.9 of the purchase agreement, plaintiff was assigned:

"The benefits, including all rights to defense and indemnity coverage, under any and all policies of liability insurance issued to [Binks] prior to the Closing Date *** with respect to insurance coverage for accidents, occurrences, claim, suits, actions or proceedings arising from the operations, activities or conduct of the Binks Business prior to the Closing Date; provided, however, that such benefits shall transfer to [plaintiff] to the extent liabilities for such accidents, occurrences, claims, suits, actions or proceedings are

threatened against, transferred to or otherwise imposed upon [plaintiff]."

¶ 22    Plaintiff argues that, under the plain terms of this section, Binks assigned to plaintiff all Binks' rights to a defense in the Enssle lawsuit because all criteria for the assignment set forth in section 1.2.9 were met: defendants' insurance policies were issued to Binks prior to the closing date in September 1998; the groundwater and soil contamination for which the Enssle suit sought damages was an accident or occurrence that arose from the operations and activities of Binks prior to the closing date; and the liability for the contamination was "threatened against" or "otherwise imposed upon" plaintiff by the Enssle lawsuit.

¶ 23    Plaintiff's argument is premised on its assertion that the Enssles' suit sought to hold plaintiff liable for groundwater and soil contamination that occurred during Binks R&D's tenancy on the property from 1959 to 1998, even though plaintiff did not begin to lease the property until 1998. In other words, that, as required in section 1.2.9, the claims asserted against plaintiff were for "accidents, occurrences, claim, suits, actions or proceedings arising from the operations, activities or conduct of the Binks Business prior to the Closing Date" for which Binks had insurance coverage. The Enssle complaint sought to hold all defendants, including plaintiff, jointly and severally liable for the contamination of the property. It asserted the contamination started sometime during Binks' use of the property, was discovered by the CDPHE in 1990 and was continued and unremediated by Binks thereafter, all of which occurred prior to the closing date. This fact scenario does appear to meet the section 1.2.9 parameters within which Binks assigned all its rights to defense and indemnity coverage to plaintiff.[5]

¶ 24    There is no question that Binks had "either actually or potentially the thing" it was attempting to assign. That "thing" was "[Binks'] benefits, including all rights to defense and indemnity coverage, under any and all policies of liability insurance issued to [Binks] prior to the Closing Date *** with respect to insurance coverage for accidents, occurrences, claim, suits, actions or proceedings arising from the operations, activities or conduct of the Binks Business prior to the Closing Date." It is uncontested that Binks had entered into valid contracts of insurance, including the policies at issue here. The policies provided that, in exchange for Binks' payment of premiums, it received the right to be defended and indemnified by the insurers for qualifying occurrences happening during the policy periods, no matter when such defense or indemnification might be needed. Granted, Binks' rights were not yet due at the time of the assignment and might never become due if no third-party claim based on the occurrences was ever filed. But Binks clearly owned those rights, whether or not it ever needed to assert them, and it could properly assign them.

---

[5]There is no support for defendants' assertion that section 1.2.9 "as a whole thus means that the right to a defense is conveyed to [plaintiff] only to the extent 'liabilities . . . are threatened' against [plaintiff] *at the time of the agreement*, but otherwise, Binks retained its right to a defense." (Emphasis added.) Nothing in section 1.2.9 or elsewhere in the purchase agreement imposes the additional condition that plaintiff would receive Binks' benefits only for claims threatened against it at the time of the agreement. The section imposes the condition that liabilities be threatened against plaintiff for Binks' actions prior to the purchase date but that is not at all the same as saying that any claims based on those actions must be threatened at the time of purchase.

¶ 25    Defendants respond that reading the section 1.2.9 assignment as plaintiff suggests would improperly increase defendants' risk because (a) they might have to defend both Binks and plaintiff and (b) the scope of their coverage would increase to cover the period plaintiff used the property after buying it from Binks, from 1998 to 2003. Defendants would neither have to defend both Binks and plaintiff nor provide a defense for plaintiff post-purchase. First, an assignee receives all the assignor's right, title or interest in the thing assigned (*Cincinnati Insurance Co.*, 387 Ill. App. 3d at 100), and that is exactly what section 1.2.9 conveys. Pursuant to section 1.2.9, "all" Binks' rights to insurance defense and indemnity coverage would be categorically assigned to plaintiff if certain stated conditions occurred. Giving "all" its customary meaning, this would necessarily mean that, when those conditions did occur and the concomitant assignment to plaintiff of all Binks' rights took place, Binks would not be able to use those rights itself because it retained none of those rights. It had given them all away. So, if plaintiff is correct that section 1.2.9 assigned it all Binks' rights to a defense under the policies, defendants were bound to defend plaintiff and not Binks. They were not bound to defend both Binks and plaintiff. The fact that defendants chose to defend Binks has absolutely no bearing on whether they had a duty to defend plaintiff. It may very well be that defendants defended Binks in error, especially if, as plaintiff asserts, Binks never requested such defense.

¶ 26    Second, an assignee can claim no greater right or interest than the assignor possessed (*Cincinnati Insurance Co.*, 387 Ill. App. 3d at 100) and nothing in the pleadings shows that plaintiff seeks anything from defendants that is beyond the scope of Binks' rights under the policies, *i.e.*, anything more than a defense for occurrences during the policy coverage periods. Indeed, plaintiff had its own insurers for the period after the purchase. Accordingly, defendants' scope of coverage was not increased by the assignment.

¶ 27    We must always interpret a contract as a whole. *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill. App. 3d 632, 637 (2008). When we do so here, reading section 1.2.9 in context with the rest of the agreement, it is clear that Binks did not assign its actual liability insurance policies to plaintiff. Section 1.2 of the agreement defines the section 1.2.9 insurance defense and coverage benefits as an "asset" plaintiff was purchasing from Binks. Section 1.3.4 then provides that the assets plaintiff purchased did not include any of Binks' liability insurance policies. The section states that, "notwithstanding the above [including section 1.2.9]," Binks retained and did not transfer "all insurance policies of [Binks], including liability *** insurance policies *** other than liability insurance policies in which [plaintiff] is a named insured." Plaintiff is not a named insured on any of Binks' liability insurance policies. Accordingly, under section 1.3.4, Binks retained those policies. Section 1.2.9 transferred only Binks' rights under some of the policies, not the policies themselves.

¶ 28    Notwithstanding defendants' argument to the contrary, interpreting section 1.2.9 as plaintiff suggests would not rob section 1.3.4 of its meaning. It is entirely possible for an entity to retain ownership of its insurance policies while assigning the benefits under those

policies to another upon the occurrence of certain specified conditions.[6] The named insured may be left without coverage for a particular liability if it gives the benefits of its policies away, but that is the insured's choice to make.

¶ 29      There is nothing in the agreement to show that Binks did not intend to do as section 1.2.9 clearly states: to assign all its benefits under "any and all policies of liability insurance issued to [Binks] prior to the Closing Date" to plaintiff if certain parameters were met. The description of the assignment sufficiently identifies the asset plaintiff purchased and that Binks conveyed. The description is necessarily broad, because neither party knew at the time of purchase whether, which or when liabilities for accidents, occurrences, claims, suits, actions or proceedings arising from the operations, activities or conduct of the Binks business prior to the closing date would be threatened against, transferred to or otherwise imposed upon plaintiff. But it is clear that the asset being conveyed is Binks' rights to defense and liability coverage under the insurance policies it held prior to the purchase date should plaintiff be pursued for any of Binks' actions prior to that date.

¶ 30      Further, in section 3.18 and its accompanying schedule, Binks identified all the insurance policies covering Binks from 1961 to 1998, including the policies at issue here. There would be no need to identify these policies for plaintiff unless, as stated in section 1.2.9, Binks intended to convey to plaintiff the benefits thereunder if plaintiff was subjected, as here, to liability for Binks' activities during the coverage period prior to the closing date.

¶ 31      Section 5.4 of the agreement reinforces our determination that Binks intended to assign all its rights to insurance defense and indemnity coverage under the policies to plaintiff. Section 5.4, titled "Consent of Third Parties," provides:

> "Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to assign or transfer any *** instrument, contract, lease, permit or other agreement or arrangement, or any claim, right or benefit arising thereunder or resulting therefrom, if an assignment or transfer or attempt to make such assignment or transfer without the consent of a third party would constitute a breach or violation therefore, or affect adversely the rights of the Purchaser or Seller thereunder, and any transfer or assignment to [plaintiff] by [Binks] of any interest under any such instrument, contract, lease, permit or other agreement or arrangement that requires the consent of a third party shall be made subject to such consent or approval being obtained."

Section 5.4 then continues that, if the consent is not obtained on or before the closing date, Binks would continue to try to obtain the consent and

> "will cooperate with [plaintiff] in any lawful and economically feasible arrangement to provide that [plaintiff] shall receive the interest of [Binks] in the benefits under any such [agreement or arrangement], including performance by [Binks], as agent, if economically feasible ***. Nothing in this Section 5.4 shall be deemed a waiver by [plaintiff] of its right to have received on or before the Closing the effective assignment of all of the Acquisition Assets, nor shall this Section 5.4 be deemed to constitute an agreement to

---

[6]As will be discussed below, an assignment of a policy or benefits may be made without consent of the insurer after the loss covered by the policy has occurred.

exclude from the Acquisition Assets any assets described under Section 2.1"

¶ 32    In other words, if Binks' failure to obtain a third party's consent to an assignment such as the section 1.2.9 assignment of Binks' rights under the policies resulted in a breach of the policies or adversely affected Binks' or plaintiff's rights under the policies, the purchase agreement would not constitute an agreement to assign those benefits and the assignment was made subject to obtaining the necessary consent. However, nothing in section 5.4 was to be deemed a waiver by plaintiff of its right to receive an effective assignment of the assets it purchased, *i.e.*, of the section 1.2.9 assignment of Binks' benefits under the policies. Further, Binks agreed to "cooperate with plaintiff in any lawful and economically feasible arrangement" in order to assure that plaintiff would receive the benefits for which it had bargained, "including performance by [Binks], as agent, if economically feasible." In no way does section 5.4, as defendants suggest, prohibit any assignment that would adversely affect Binks' rights. Instead, Section 5.4 shows that Binks agreed to provide plaintiff with any assigned benefits that proved unavailable because of Binks' failure to obtain consent for that assignment, presumably paid from Binks' own funds.

¶ 33    This is similar to Binks' indemnification of plaintiff in sections 1.9.1 through 1.9.3, in which Binks agreed to indemnify plaintiff for (section 1.9.1) any costs, damages or liability plaintiff suffered arising from Binks' untrue representations, breach of warranty or nonfulfillment of a covenant; (section 1.9.2) any injuries suffered in connection with Binks' liabilities that plaintiff had not expressly assumed; and (section 1.9.3) any of Binks' debts, liabilities or obligations which existed or would arise after the closing date for acts or omissions which occurred or existed on or before the closing date, *"whether or not then known*," including "Schedule 3.21 regarding environmental matters for which [Binks] will indemnify [plaintiff] regardless of any facts or circumstances of which [plaintiff] may have knowledge."[7] (Emphasis added.) Indeed, in section 10.3 of the agreement, Binks agreed to indemnify plaintiff for up to $25 million, almost one-third of the approximately $80 million purchase price paid by plaintiff for the asset purchase. Taken as a whole, the contract shows that, in exchange for plaintiff's $80 million, Binks intended to indemnify plaintiff for much that could go wrong or might prove false under the agreement, including its inability to

---

[7]Although plaintiff had agreed to assume assorted liabilities and obligations arising from Binks' business, it specifically did not assume "environmental liabilities and costs to the extent not accrued on the Financial Statements" (section 1.5.1.1); any obligation or liability of Binks for breach of a lease or contract occurring prior to the closing date of the purchase (section 1.5.1.2); and "any claims, liabilities, obligations or commitments of [Binks] relating to or arising out of the operation of Binks Business or the ownership of Acquisition Assets prior to the Closing other than the Assumed liabilities" (section 1.6). Under the agreement, therefore, plaintiff did not assume Binks' liabilities for the environmental contamination because no such liabilities were reflected on the financial statement at the time of the sale. It did not assume Binks' obligations or liabilities for Binks' breach of the Enssle lease, *i.e.*, for Binks' contamination of the property and failure to clean up the property pursuant to the lease, because such occurred prior to the closing of the purchase. It also did not assume any other liabilities arising from Binks' business, such as contamination issues, prior to the closing of the purchase. If plaintiff did not assume those liabilities, specifically the environmental contamination liabilities, Binks necessarily retained them.

transfer its benefits under the insurance policies due to failure to obtain consent. There is no question Binks intended to assign those benefits to plaintiff. Its failure to request a defense from defendants shows as much.

¶ 34                                                      Consent

¶ 35        This brings us to the question of whether Binks could assign its benefits under the policies without defendants' consent to the assignment. It is uncontested that defendants were not aware of and, therefore, did not agree to Binks' assignment or potential assignment of any policy benefits to plaintiff. Defendants asserted below that the insurers' policies all contained consent-to-assignment clauses prohibiting assignment of any interest under the policies without insurer consent. They argued, therefore, as they do here, that Binks' insurance rights were not assignable in 1998 absent the insurers' consent and such consent was not given. The circuit court granted judgment on the pleadings to defendants partially on this basis, finding that plaintiff did not qualify as an insured under defendants' policies because defendants did not agree to the assignment. Plaintiff argues the court erred in this finding because no consent to assignment is needed when benefits are assigned after a loss has occurred and here the loss, the contamination of the Enssles' property, occurred before the assignment.

¶ 36        Antiassignment clauses notwithstanding, no consent was needed for Binks' assignment of its benefits under defendants' policies. The policies are third-party occurrence-based policies–meaning that they provide coverage for occurrences during the coverage period, no matter when the claims for those occurrences might be pursued. They provide the insured with protection against future claims by third parties for covered losses incurred by the third parties as a result of the insured's actions during the coverage period. Defendants could expect to provide the contracted defense and liability coverage, *i.e.*, pay for the losses, possibly many years after the policy expired. Once a covered loss has occurred, the insured's assignment of its right to liability coverage or a defense relating to those losses does not require consent from the insurer because the assignment is essentially the assignment of payment of a claim already accrued, a claim consisting of the right to a defense and indemnification.

¶ 37        The purpose of an antiassignment clause is to prevent the increase of risk to an insurer without the insurer's consent. *National Discount Shoes, Inc. v. Royal Globe Insurance Co.*, 99 Ill. App. 3d 54, 58 (1981). The insurer has the right to the benefit it anticipates from the character, credit and substance of the party with which it contracted. *Ginsburg v. Bull Dog Auto Fire Insurance Ass'n of Chicago*, 328 Ill. 571, 573 (1928). However, once an insurance policy has been executed, those elements are no longer material and all that remains to be done under the policy is to pay the amount due, if any. *Ginsburg*, 328 Ill. at 573. This is true whether the policy is a first-party insurance policy or a third-party insurance policy. Under a first-party policy, the "amount due" or policy proceeds consist of what the insurer owes the insured directly for losses the insured suffered. Under a third-party policy, the "amount due" or policy proceeds consist of the defense and/or indemnification the insurer owes the insured against third-party claims for covered losses the third party suffered as a result of the

insured's action or inaction. Under both a first-party policy and a third-party policy, the insurer had the opportunity to choose its insured, to choose the risks attendant to the insured's business operations that it wished to cover and to choose how much it wanted to charge for covering the risks. Once the policy is executed, the risks are set. Whether a named insured or an assignee claims coverage or defense for the occurrences/risks covered by the policy, those risks remain the same.

¶ 38    Once an insurance policy is executed, it only remains to be seen whether any occurrences/losses for which the insurer took on the risk and the insured bought coverage will occur during the policy coverage period and whether claims for those losses will be brought, whether for direct losses to the insured under a first-party policy or for defense and indemnification for third-party losses resulting from the insured's actions under a third-party policy. The risks do not change or increase after the period expires or if an assignee rather than the named insured seeks coverage for losses. The final dollar amount of the defense/liability might be in question under a third-party policy but the underlying risk is the same.

¶ 39    If Binks had assigned its benefits under the policies to multiple parties, defendants might have been required to defend the same action multiple times and its risks could arguably have been increased by the assignment. But Binks only assigned its benefits to a single assignee and the risk to defendants, therefore, remained the same. As stated previously, when Binks transferred its rights to a defense to plaintiff, it no longer had those rights because it gave them all away.

> " 'The idea that an insurer would have to defend both the transferor and the transferee for the same risk is not sound. If the right to a defense has been transferred to a successor, the transferor no longer has that right. The right cannot both be transferred and retained.' " *Cincinnati Insurance Co.*, 387 Ill. App. 3d at 105 (quoting *Pilkington North America, Inc. v. Travelers Casualty & Surety Co.*, 2006-Ohio-6551, 861 N.E.2d 121, at ¶ 75).

Defendants would not have to defend both Binks and plaintiff and the risks it contracted for would remain the same after the assignment.

¶ 40    The question then becomes whether Binks' assignment to plaintiff occurred before or after the covered loss. There is a difference between assignment of an insurance policy before loss and assignment of a claim for loss after the loss has occurred. *Ginsburg*, 328 Ill. at 572.[8] An assignment of a policy after loss relates to the cause of action an insured has and not to the policy. *Ginsburg*, 328 Ill. at 574. Therefore, notwithstanding the existence of an anti-assignment or consent provision, a policy may be assigned after a loss without notice to or consent of the insurer, unless such is required by statute. *Ginsburg*, 328 Ill. at 574. "An

---

[8]There is little distinction between assignment of an insurance policy and assignment of benefits under a policy. Those benefits are, after all, the entire purpose for taking out an insurance policy. Cases discussing whether consent is required for assignment of a "policy" are, therefore, relevant to our examination of whether consent was required for Binks' assignment of its benefits under the policies.

assignment after loss is not the assignment of the policy but the assignment of a claim or debt–a chose in action." (Internal quotation marks omitted.) *Ginsburg*, 328 Ill. at 574.

¶ 41    "An insurance policy that is assigned after a claim arises is an assignment of the policy proceeds; such a transaction results in an assignment of a chose in action which does not require the insurer's consent." *Young v. Chicago Federal Savings & Loan Ass'n*, 180 Ill. App. 3d 280, 285 (1989).

> " '[T]he great weight of authority supports the rule that general stipulations in policies prohibiting assignments thereof except with consent of the insurer apply to assignments before loss only, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising thereunder, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim.' " *Young*, 180 Ill. App. 3d at 284 (quoting 16 Mark S. Rhodes, Couch Cyclopedia of Insurance Law, § 63:40, at 763-65 (2d rev. ed. 1983)).

¶ 42    We find Binks' assignment to plaintiff occurred after the loss.

> "[A]n insured's loss would seem to be his or her injury, whether to himself, property, or business expectations. Under a fire policy, for example, an insured's loss may be the damage to the burned building, contents, and interruption of business. The loss would not equate with the actual reconstruction of the building ***." *Loyola University Medical Center v. Med Care HMO*, 180 Ill. App. 3d 471, 477 n.2 (1989).

Following this reasoning, contrary to the circuit court's finding, we find the "loss" here was not the Enssle suit, which was filed in 2003 and a defense to which could, therefore, not have been assigned in 1998 since the suit did not yet exist. Rather, the loss was Binks' contamination of the Enssles' property, an occurrence for which Binks had bought defense and indemnification coverage. Once an injury or loss occurs, the chose in action is established and assignable without the consent of the insurer. *Ginsburg*, 328 Ill. at 573.

¶ 43    Pursuant to the Enssle complaint, the contamination occurred well before the assignment in 1998. The Enssles asserted the CDPHE found environmental violations, including soil contamination, in 1990, and Binks knew about its obligation to remediate the problem and failed to do so. Further, in section 3.24 of the 1998 purchase agreement, Binks disclosed to plaintiff that it was involved in proceedings with the CDPHE regarding "contamination of soil and groundwater" at the property. Since the problems were discovered in 1990 and, as Binks disclosed in 1998, it was still dealing with the CDPHE over that contamination at the time of the purchase, the contamination must necessarily have occurred prior to the purchase/assignment. Defendants admitted such in their answers to plaintiff's complaint, stating that the allegations in the Enssle complaint "rest significantly upon the ongoing claims of the CDPHE since 1990."

¶ 44    Because the contamination existed well before the sale of Binks' assets in 1998, any chose in action, *i.e.*, any future claim by Binks for its agreed-to defense and indemnification necessitated by that contamination, was assignable in 1998. What Binks assigned plaintiff was Binks' then-present conditional right to the insurance proceeds, to its right to defense and indemnification should a third-party suit based on that loss arise. A valid assignment of

a conditional right is enforceable in equity. *Loyola University Medical Center*, 180 Ill. App. 3d at 478. Binks' conditional right to defense and indemnification against third-party suit for covered occurrences existed as soon as it paid its premium. This right was not dependent on whether or when the insurers' duty to defend a particular suit was triggered, *i.e.*, dependent on whether a third party actually filed suit against Binks for a covered occurrence. Filing of a third-party suit impacted whether Binks would need to assert its right to defense and indemnification, not whether that right existed.

¶ 45     We find no merit to defendants' assertion that plaintiff is judicially estopped from asserting its rights as an assignee. Defendants argue that plaintiff's position that it was assigned all Binks' rights to coverage is inconsistent with its earlier position in the bankruptcy action that Binks retained all its coverage. Putting aside the question of whether documents from the bankruptcy proceeding, *i.e.,* documents arguably outside the pleadings, can be relied on in deciding a motion for judgment on the pleadings, we do not find plaintiff's assertions inconsistent. Here, plaintiff is only seeking a defense for property damage that occurred during the coverage period of defendants' policies, 1976 through 1986.

¶ 46     As plaintiff explained to the bankruptcy court when it requested relief from the automatic stay in Binks' bankruptcy case, it intended to file a cross-claim against Binks in the Enssle case in order to enforce its contractual indemnification rights against Binks under the purchase agreement "against [Binks'] insurance coverage." Plaintiff told the bankruptcy court its cross-claim against Binks "could permit it to recover part or all of its indemnification claim against [Binks] from [Binks'] insurance carriers." As discussed previously, Binks had agreed to indemnify plaintiff for a myriad of costs, liabilities and problems that might arise as a result of Binks' actions prior to the purchase or under the agreement. Schedule 3.18 of the agreement lists all the insurance policies maintained by Binks, covering from 1961 to 1998, 43 pages of them. Binks did not just have defendants' policies, it had a score of others, among them contractual liability and general liability policies that could be called on by Binks to pay the judgment on plaintiff's cross-claims, policies entirely unrelated to the policies providing plaintiff with a defense against liability for Binks' contamination of the property. Plaintiff's position in the bankruptcy court is not inconsistent with its stance here and it is not estopped from arguing it was assigned Binks' right to a defense under defendants' policies.

¶ 47     Based on the pleadings, we find that plaintiff sufficiently showed that it had been assigned Binks' rights to a defense under Binks' insurance policies with defendants; the assignment was valid; no consent was required for the assignment; and the Enssle complaint seeking to hold plaintiff jointly and severally liable for Binks' contamination of the property throughout the coverage period of defendants' policies on its face alleged facts within or potentially within coverage.

¶ 48     "The threshold for pleading a duty to defend is minimal. [Citation.] If an underlying complaint alleges facts within or potentially within coverage, an insurer is obligated to defend its insured even if the allegations are groundless, false or fraudulent." *Cincinnati Insurance Co.*, 387 Ill. App. 3d at 107. An insurer can justifiably refuse to defend an insured only if it is clear from the face of the underlying complaint that the allegations do not state acts which bring the cause of action within or potentially within coverage. *Cincinnati*

*Insurance Co.*, 387 Ill. App. 3d at 108. Here, the underlying complaint sufficiently alleged that the loss occurred during the period of coverage and, concomitantly, that the conditions upon which the assignment would take place had occurred. Defendants, therefore, had a duty to defend plaintiff and the court erred in finding otherwise. The court's order granting judgment on the pleadings to defendant is reversed. Given this determination, we need not address plaintiff's other points of error addressing this issue.

¶ 49　　　　The court also erred in denying plaintiff's motion for judgment on the pleadings for counts I and II of plaintiff's three-count complaint. In count I, plaintiff sought a declaration that defendants owed plaintiff a duty to defend in the Enssle suit and reimbursement for all defense costs it expended in that suit. In count II, it sought damages for defendants' breach of their duties to defend plaintiff and reimbursement of its defense costs. As the circuit court noted, there was no dispute below regarding whether the allegations in the Enssles' complaint triggered defendants' duty to defend. Indeed, given that defendants defended Binks in the Enssle suit, it is clear they considered Binks to have coverage for the suit. As held above, Binks validly assigned all its rights to that coverage to plaintiff. Plaintiff, therefore, had coverage for a defense in the Enssle action and defendants' breached their duty to defend plaintiff by refusing to provide that defense. The court erred in denying plaintiff's motion for judgment on the pleadings on counts I and II of its complaint.

¶ 50　　　　For the reasons stated above, we (1) reverse the order of the circuit court granting judgment on the pleadings to defendants; (2) order the court to grant judgment on the pleadings to plaintiff on counts I and II of its complaint; and (3) remand for further proceedings.

¶ 51　　　　Reversed and remanded.