FIRST DIVISION

No. 1-07-1953

| | | |
|---|---|---|
| MARX TRANSPORT, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| AIR EXPRESS INTERNATIONAL CORPORATION, | ) | No. 03 M2 2904 |
| d/b/a Danzas AEI, and CORNING, INC., | ) | |
| | ) | |
| Defendants-Appellees | ) | |
| | ) | |
| (North American Expediting, Inc., | ) | Honorable |
| | ) | Mary K. Rochford, |
| Defendant). | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Marx Transport, Inc. (Marx), a motor carrier, brought this action in the circuit court of Cook County seeking to recover freight charges relating to over-the-road shipments of goods picked up from a facility owned by Corning, Inc. (Corning), located in Harrodsburg, Kentucky, and shipped to two airports for overseas delivery between January 30, 2003, and May 8, 2003. North American Expediting, Inc. (North American), contacted Marx to transport the goods to the airports, and Air Express International Corporation, d/b/a Danzas AEI (Danzas), was hired by Corning to coordinate the movement of the overseas shipments. Danzas contacted North American to handle the

over-the-road shipments from the Corning facility to two domestic airports.[1] Marx obtained a $50,070 default judgment against North American, which failed to appear and was insolvent, and proceeded to trial against Danzas and Corning. After a bench trial, the trial court found in favor of Corning and Danzas and against Marx. Marx now appeals.

BACKGROUND

On November 13, 2003, Marx filed a verified complaint seeking to recover damages against North American, Danzas and Corning. Marx alleged that between January 30, 2003, and May 8, 2003, Corning retained Danzas as its agent to arrange for the transportation of goods from Corning's facility and that Danzas, in turn, retained North American, which arranged for over-the-road transportation by contracting with Marx for about 60 separate shipments from Corning's Kentucky facility to O'Hare International Airport in Chicago, Illinois, and to the Northern Kentucky International Airport in Erlanger, Kentucky. Marx sought damages in the amount of $47,690, along with prejudgment interest.

In its verified answer, Corning admitting that it had a written or oral contract with Danzas for the shipment of its goods, but denied that it had requested or retained Marx to handle the shipments. Corning also pled as an affirmative defense that it was not in privity of contract with Marx and that Marx had contracted only with North American. Marx filed its verified reply denying Corning's affirmative defense.

_____

[1] When applicable, Corning and Danzas will sometimes collectively be referred to as defendants.

Thereafter, Marx filed an amended verified complaint that was not substantially different from its original verified complaint.

On September 15, 2005, Danzas and Corning filed a combined motion for summary judgment on the grounds that Marx never had a contract or agreement with either Corning or Danzas and that Marx understood that it was to look solely to North American for payment. The trial court denied the defendants' motion for summary judgment on March 28, 2006.

Thereafter, the defendants filed a motion to reconsider. Marx filed a response and a cross-motion for summary judgment. The defendants filed a reply in support of their motion to reconsider. The trial court denied both motions on November 2, 2006, and the case proceeded to trial.

Before trial, the defendants filed a trial brief, which included the parties' stipulations, exhibits and the deposition testimony of Marx's corporate president.

On June 15, 2007, the trial court conducted a bench trial. The record contains no transcript of the record of proceedings. The following discussion is based on the stipulations between the parties.

Prior to January 30, 2002, Corning hired Danzas to coordinate the movement of certain shipments of Corning's goods from its facility in Harrodsburg, Kentucky, to various overseas destinations. These shipments were to be transported by ground from Harrodsburg, Kentucky, to O'Hare International Airport in Chicago, Illinois, or to the Northern Kentucky International Airport in Erlanger, Kentucky, for transport by air.

At various times between January 30, 2003, and May 8, 2003, Danzas hired North American to handle the movement of some of these shipments. A letter from the district manager for Danzas stating that all invoices for shipments moved to North American and handled by Marx had been paid in full to North American was included in the parties' stipulation.

As is customary in the shipping industry, North American was allowed to transport the goods over-the-road on its own or to contract the shipments to other carriers. Corning and Danzas had knowledge that Marx performed some of the shipments.

Corning prepared documents entitled "shipper's letters of instruction" for the shipments to provide the shipping details to Danzas and to authorize Danzas to execute the necessary documents for the movement of Corning's goods. Attached as Exhibit 2 to the parties' stipulation was a representative "shipper's letters of instruction," which stated:

"On receipt of the shipment described below, Danzas *** is requested by and authorized to prepare and issue the necessary air waybill or bill of lading in the name of the undersigned, consign such shipment for carriage to destination or for onward carriage and deliver by any other transportation organization in accordance with the terms and conditions contained in the air waybill or bill of lading, tariffs, rules and regulations,

and to prepare and execute in shipper's name any documents requested for export."

Marx was referenced in the lower right hand corner of a number of the documents entitled "shipper's letters of instruction."

The representative "shipper's letters of instruction" identified Corning as exporter, its Kentucky facility as the place of pickup, one of Corning's overseas affiliates as the "ultimate consignee," and the final destination. None of the shipper's letters of instruction prepared by Danzas identified O'Hare International Airport or the Northern Kentucky International Airport as a "stop" or "destination."

The terms of the agreements between Marx and North American relating to the shipments performed by Marx were memorialized in documents prepared by Marx on its letterhead after each shipment. One of these agreements was attached to the stipulations as Exhibit 3. The agreement stated that "[North American] agrees to pay [Marx] for the transportation of the following," followed by a description of the goods shipped.

Neither Corning nor Danzas retained Marx. When Marx completed its shipments, it submitted invoices for payment to North American. A copy of a Marx invoice was attached to the stipulation as Exhibit 4. Marx never submitted an invoice to either Danzas or Corning.

Corning paid Danzas for all transportation services that Danzas provided to it. Danzas paid North American for its services. Copies of the checks issued to Danzas and

made payable to North American in excess of $89,000 were attached as Exhibit 5 to the parties' stipulations. North American did not pay Marx for its freight services.

Also attached to the parties' stipulation was the discovery deposition of Mark Jakubowski, Marx's corporate president. Jakubowski testified that he was responsible for booking freight and dealing with customers and drivers. Carl Sprock of North American originally contacted Jakubowski in regard to the shipments. Jakubowski negotiated the rates for the shipments directly with Sprock, and never negotiated with Corning or Danzas. Jakubowki described North American as a "freight forwarder" in his deposition testimony. He also stated that Marx never entered into a written contract with Danzas or Corning.

Jakubowski stated that the "shipper's letters of instruction" attached to the parties' stipulation as Exhibit 2 was not a bill of lading and that there were no bills of lading for the shipments. The letters of instruction were prepared prior to or at the time that Marx's drivers were sent to pick up a shipment at Corning's facility and were given to the drivers upon their departure.

The "shipper's letters of instruction" did not state what Marx was to be paid for the shipment. The letter did not provide where Marx was to transport the shipment.

The drivers signed the shipper's letter for each shipment after they arrived at the Corning facility in Kentucky. These drivers were not Marx employees but independent contractors. No employees of Marx had personal contact with Danzas; only the contract drivers had contact with Danzas.

Jakubowski stated that he believed North American would have terminated Marx had Marx contacted anyone from Danzas or Corning without North American's permission. Marx's only contact with Danzas came on two occasions when Marx delivered shipments to the wrong airline and the respective drivers called Danzas to inquire as to which airline the shipments should have been delivered to. Marx's only contact with Corning came when Marx received an incorrect shipping number from North American.

Marx never sent an invoice to or sought payment from Danzas or Corning. Jakubowski stated that the agreement (Exhibit 3) was intended for North American and had no signature line for Danzas or Corning.

In finding for the defendants and against Marx, the trial court specifically relied on *Jackson Rapid Delivery Service, Inc. v. Thompson Consumer Electronics, Inc.*, 210 F. Supp. 2d 949 (N.D. Ill. 2001), and found that "if Exhibit 2 is a Bill of Lading, it did not set out the terms of the contract between Danzas/Corning and Marx and that the court must look beyond the document to the parties' dealings per *Jackson*." Finally, the trial court found that "[w]hen the court looks at the parties' dealings it is evident that Marx was to be paid by [North American]" and that Danzas and Corning were therefore not liable to Marx for the charges.

Marx appeals the judgment of the trial court.

7

No. 1-07-1953

ANALYSIS

As noted, this appeal was taken from the final judgment of the trial court after a bench trial. Before addressing the merits of this appeal, we must discuss Marx's failure to file a report of proceedings with this court. The burden rests on the appellant to provide a sufficient record to support a claim of error, and in the absence of such a record, the reviewing court will presume that the trial court's order was in conformity with established legal principles and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). "[I]n the absence of a proper record a reviewing court may dismiss an appeal or, in the alternative, summarily affirm the judgment of the trial court." *Landau & Associates, P.C. v. H. Daniel Kennedy*, 262 Ill. App. 3d 89, 92 (1987). On the other hand, "[t]he 'failure to present a report of proceedings does not require automatic dismissal or affirmance where issues can be resolved on the record as it stands.' " *Laudau*, 262 Ill. App. 3d at 92, quoting *Frisch Contracting Service Co. V. Personnel Protection, Inc.*, 158 Ill. App. 3d 218, 221 (1987). We find that dismissal or summary affirmance is not necessary in this case, as the issues on appeal can be resolved on the record as it stands. Included in the record are the parties' stipulations at trial and the trial court's order stating its reasons for finding in favor of defendants and against Marx.

We now proceed to address the issues raised by Marx on appeal. The trial court found that "if Exhibit 2 is a Bill of Lading, it did not set out the terms of the contract between Danzas/Corning and Marx and that the court must look beyond the document to the parties' dealings" and that "[w]hen the court looks at the parties' dealings it is evident

8

that Marx was to be paid by [North American]" and that Danzas and Corning were therefore not liable to Marx for the charges. Although not stated in the trial court's order, we assume that the trial court found that the document attached to the parties' stipulation as Exhibit 2 was ambiguous before moving on to a consideration of the parties' dealings to explain the terms of the document.

The parties agree that the applicable standard of review from the findings and decisions of the trial judge after a bench trial is whether the findings and decisions of the trial court were against the manifest weight of the evidence. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). However, we review *de novo* that part of the trial court's decision that involved contract interpretation; specifically, we review *de novo* the trial court's finding of ambiguity in the document attached to the parties' stipulation as Exhibit 2. *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 416 (2006) (stating that whether a contract is ambiguous is a question of law, subject to *de novo* review).

In its complaint, Marx alleged that Corning and Danzas breached a contract when they did not pay Marx for its carrier services. Defendants assert that the facts demonstrate that a contract was never formed between themselves and Marx. In their brief to this court, defendants tread carefully to avoid labeling the document attached as Exhibit 2 to the parties' stipulations as a bill of lading. Defendants argue that the "shipper's letters of instruction" served only as receipts and do not represent an

9

agreement between themselves and Marx. Marx argues that the representative document attached as Exhibit 2 is a bill of lading and as such constituted a direct contract between defendants and Marx.

We find that the representative document attached as Exhibit 2 to the parties' stipulations is a bill of lading. A "bill of lading" is defined as "a document acknowledging the receipt of goods by a carrier" and as "a document that indicates the receipt of goods for shipment and that is issued by a person engaged in the business of transporting or forwarding goods." Black's Law Dictionary 176 (8th ed. 2004). Exhibit 2 was produced by Danzas and was intended to represent a receipt of the goods that Danzas received from Corning for shipment. The document lists the consigner Corning, the shipper Danzas, and the ultimate consignee, Corning's overseas affiliate. The document describes the goods released into the possession of the shipper, Danzas, and specifically authorizes Danzas to:

> "prepare and issue the necessary air waybill or bill of lading in the name
> of the undersigned, consign such shipment for carriage to destination or
> for onward carriage and deliver by any other transportation organization in
> accordance with the terms and conditions contained in the air waybill or
> bill of lading, tariffs, rules and regulations, and to prepare and execute in
> shipper's name any documents requested for export."

We also find that Marx's relationship with defendants and North American is governed by the bills of lading. The drivers that were hired by Marx to deliver Corning's

10

goods signed some of the bills of lading as evidenced by the representative bill of lading attached to the parties' stipulations as Exhibit 2. Furthermore, the name Marx Transport is handwritten into the space provided on the representative bill of lading for the truck line that was to convey the goods from Corning's Kentucky facility to O'Hare International Airport in Chicago, Illinois.

Our operative concern however, is not whether Exhibit 2 is a bill of lading or if Marx is a party to it, but rather whether there was a contract between either Corning or Danzas and Marx that would obligate Corning or Danzas to repay for services for which they have already paid North American. As the court in *Jackson Rapid Delivery Service* (specifically relied upon by the trial court in the case at bar) stated, "[p]ut simply, a shipper will be liable to a contract carrier if it agreed to pay the carrier." *Jackson Rapid Delivery Service, Inc. v. Thompson Consumer Electronics Inc.*, 210 F. Supp. 2d 949, 952 (2001), citing *Louisville & Nashville R.R. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 66, 68 L. Ed. 900, 902-03, 44 S. Ct. 441, 442 (1924). Exhibit 2 is important, however, since it operates as our starting point for the determination of whether Corning or Danzas has an obligation to pay Marx for its freight services. "To determine if there is a contractual promise to pay [courts] look primarily to the bills of lading; bearing in mind that the instrument serves both as receipt and as a contract." *Jackson Rapid Delivery Service*, 210 F. Supp. 2d at 952. The consigner, in this case Corning, generally remains primarily liable unless the bill of lading or a course of dealing provides otherwise. *Jackson Rapid Delivery*, 210 F. Supp. 2d at 952, citing *Southern Pacific Transportation*

11

No. 1-07-1953

*Co. v. Commercial Metals Co.*, 456 U.S. 336, 343, 72 L. Ed. 2d 114, 121, 102 S. Ct. 1815, 1820 (1982).

Responsibility for payment can be shifted from the consigner to a third party. *Jackson Rapid Delivery*, 210 F. Supp. 2d at 952, citing *Missouri Pacific R.R. Co. v. Center Plains Industries, Inc.*, 720 F.2d 818 (5th Cir. 1982) (noting that the customary means for a consigner to avoid responsibility for payment is through a nonrecourse clause in the bill of lading). The parties to a shipping agreement are free to contract when and who will pay the freight charges. *Jackson Rapid Delivery*, 210 F. Supp. 2d at 952, citing *C.A.R. Transportation Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 479 (9th Cir. 2000).

The bills of lading in this case are ambiguous in that nothing in the bills of lading indicates how much Marx was to be paid for its services or who would pay the charges for the services. This ambiguity raises questions about the payment arrangement, and as a result, the trial court correctly found that it must look beyond the bills of lading to determine whether Corning, Danzas, or North American was responsible for payment to Marx.

Neither party to the instant suit has done other than what it was expected to do; Marx transported the goods as arranged by North American, and defendants paid North American when billed.

As the court in *Jackson Rapid Delivery* observed, when a shipper or consigner pays the freight-forwarder, in this case North American, and the payments are not sent on

12

to the carrier, here Marx, one of two innocent parties will be the loser. *Jackson Rapid Delivery*, 210 F. Supp. 2d at 953. Courts have taken different views as to whom the loser should be. *National Shipping Co. of Saudi Arabia v. Omni Lines, Inc.*, 106 F.3d 1544, 1545 (11th Cir. 1997).

Some courts lean toward a "semi-strict" liability for shippers. *National Shipping Co. of Saudi Arabia*, 106 F.3d at 1546. These decisions reason that unless the carrier intends to release the shipper from its duty to pay under the bill of lading, the shipper remains liable to the carrier, irrespective of the shipper's payment to a freight forwarder. *National Shipping Co. of Saudi Arabia*, 106 F.3d at 1546.

Other courts have reasoned that the carrier should be the party that suffers the loss. *National Shipping Co. of Saudi Arabia*, 106 F.3d at 1545-46. One view holds that the doctrine of equitable estoppel bars carriers from recovering freight charges where the shippers were justified in believing that the carriers have been paid for their services. *National Shipping Co. of Saudi Arabia*, 106 F.3d at 1546, citing *Olson Distributing Systems, Inc. v. Glasurit American, Inc.*, 850 F.2d 295, 296 (6th Cir. 1988). The other view holds that the carrier should suffer the loss because the carrier extended credit to the freight forwarder, in which case the carrier's only recourse should be against the forwarder. *National Shipping Co. of Saudi Arabia*, 106 F.3d at 1545, citing *Compania Sud Americana de Vapores v. Atlantic Caribbean Shipping Co.*, 587 F. Supp. 410, 413 (S.D. Fla. 1984).

13

Without expressing an opinion as to the best approach to be applied in all circumstances, we find that the facts of this case warrant application of the last view. We conclude, based on the evidence in this case, that the trial court's determination that defendants have no obligation to pay again was not against the manifest weight of the evidence.

The parties' interactions are most informative in determining the parties' responsibilities to each other. A review of the record, including the parties' stipulations and all attached exhibits, makes clear that Danzas expected to be paid by Corning, that North American expected to be paid by Danzas, and that Marx expected to be paid by North American. Among other evidence, the deposition of Mark Jakubowski, Marx's corporate president, is most helpful.

As noted, Jakubowski testified that he was responsible for booking freight and dealing with customers and drivers. He stated that Carl Sprock of North American originally contacted him in regard to the shipments at issue in the case at bar. He negotiated the rates for the shipments directly with Sprock and never negotiated with Corning or Danzas. Despite our determination to the contrary, Jakubowski stated that Exhibit 2 was not a bill of lading and that there was no written contract with Marx and either defendant.

The terms of the agreements between Marx and North American relating to the shipments performed by Marx were memorialized in documents prepared by Marx on its letterhead after each shipment. Those documents stated that "[North American] agrees to

14

pay [Marx] for the transportation of the following," followed by a description of the goods shipped.

Neither Corning nor Danzas retained Marx. When Marx completed its shipments, it submitted invoices for payment to North American. Marx never submitted an invoice to either Danzas or Corning, and there was no evidence presented that the defendants were to be guarantors for payment.

Corning paid Danzas for all transportation services that Danzas provided to it. Danzas paid North American for its services.

To summarize, Marx dealt with North American as an independent contractor and permitted balances to build up over approximately 60 deliveries, without any notification to Corning or Danzas. Marx created the risk of loss by its credit practices and, having accepted North American as the obligor, cannot now recast the transaction. *Jackson Rapid Delivery Service*, 210 F. Supp. 2d at 953.

Marx has made no argument in its brief that North American acted as either defendant's agent when contracting with Marx or when receiving money from the defendants. As a consequence, these arguments are waived. 210 Ill. 2d R. 341(h)(7).

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

WOLFSON and GARCIA, JJ., concur.

15

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
## (Front Sheet to be attached to each Opinion)

_____

Please use the]
following form:]

| | |
|---|---|
| ] | MARX TRANSPORT, INC., |
| ] | |
| ] | Plaintiff-Appellant, |
| ] | |
| ] | v. |
| ] | |
| ] | AIR EXPRESS INTERNATIONAL CORPORATION, |
| ] | d/b/a Danzas AEI, and CORNING, INC., |
| ] | |
| ] | Defendants-Appellees |
| ] | |
| ] | (North American Expediting, Inc., |
| ] | |
| ] | Defendant). |

Complete      ]
  TITLE        ]
of Case.      ]

_____

Docket No.    ]        No. 1-07-1953
              ]     Appellate Court of Illinois
COURT         ]    First District, First Division
              ]
              ]        FEBRUARY 25, 2008
              ]_____

_____
Opinion Filed ]       (Month, Day and Year)

_____

              ]
JUSTICES      ]  JUSTICE ROBERT E. GORDON delivered the opinion
_____       ]  of the court.
              ]
              ]  WOLFSON and GARCIA, JJ., concur.

_____

APPEAL from the]  Lower Court and Trial Judge(s) in form indicated
Circuit Court  ]  in margin:
of Cook County;]  Appeal from the Circuit Court of Cook County.
the Hon:_____ ]
Judge Presiding]  Honorable Mary K. Rochford, Judge Presiding.

_____

For APPELLANTS ] Indicate if attorney represents APPELLANTS or
John Doe of    ] APPELLEES and include attorneys of counsel.
Chicago.       ] Indicate the word NONE if not represented.
For APPELLEES, ]_____
Smith and      ]     Kurt E. Vragel, Jr., P.C.
Smith, of      ]     Glenview, Illinois  60025
Chicago.       ]     Attorney for Appellant
Brown,         ]     Attn:  Kurt E. Vragel, Jr.
of Counsel.    ]          OF COUNSEL
              ]
              ]     SmithAmundson, LLC
              ]     Chicago, Illinois  60601
              ]     Attorneys for Appellees
              ]     Attn: Michael Resis and John C. Neel

No. 1-07-1953

<pre>
                        ]              OF COUNSEL
Also add atty. ]
for third party]
appellants     ]
or appellees.  ]
               ]
_____(USE REVERSE SIDE IF NEEDED_____
</pre>

17