In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3316

NATIONWIDE FREIGHT
SYSTEMS, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

ILLINOIS COMMERCE
COMMISSION, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 2486— **James F. Holderman**, *Judge.*

ARGUED DECEMBER 12, 2014 — DECIDED APRIL 23, 2015

Before ROVNER, WILLIAMS, and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* The appellants in this case are three motor carriers that were cited for engaging in intrastate operations in Illinois without a license from the Illinois Commerce Commission (the "ICC" or "Commission"). When the ICC conducted a follow-up investigation of the carriers and

requested documents relating to their operations in Illinois, the carriers refused to comply, reasoning that because the documents sought by the ICC would reveal their rates, routes, and services, the requests were "related to" those rates, routes, and services and therefore were preempted by the Federal Aviation Administration Authorization Act of 1994 (the "FAAAA"), 49 U.S.C. § 14501(c). The ICC rejected the carriers' argument and fined them for their failure to comply with the document requests, prompting the carriers to file suit seeking a judgment declaring the ICC's enforcement efforts preempted. The district court granted summary judgment to the ICC, concluding that the document requests, although they might reveal the carriers' rates, routes, and services, had no significant economic impact on them. Alternatively, the court found that the ICC's efforts to enforce its licensing requirement, which serves as a means of verifying a carrier's insurance coverage, is exempted from federal preemption. *Nationwide Freight Sys., Inc. v. Baudino*, No. 12 C 2486, 2013 WL 5346450 (N.D. Ill. Sep. 23, 2013). We agree on both points and affirm.

## I.

Since 1953, Illinois has prohibited motor carriers of property from conducting intrastate operations without first procuring a license from the ICC. *See* 1953 Ill. Laws 933, 937-38; 625 ILCS 5/18c-4104(1)(a). Section 4104 of the Illinois Commercial Transportation Law currently deems it unlawful to "[o]perate as an intrastate motor carrier of property without a license from the Commission; or as an interstate motor carrier of property without a registration from the Commission." 625 ILCS 5/18c-4104(1)(a). Obtaining a license for intrastate operations in turn requires a carrier to carry appropriate

insurance or surety coverage. 625 ILCS 5/18c-4901 & 4402(2)(b). Procedurally, a carrier complies with the licensing requirement by completing an application and submitting proof of its insurance or bond coverage along with an administrative fee. *See id.*; 92 Ill. Admin. Code § 1301.30(a). A carrier is then issued a public carrier certificate which states, *inter alia*, that "[t]he holder of this license certifies to the Commission that it will perform transportation activities only with the lawful amount of liability insurance in accordance with 92 Ill. Admin. Code 1425." R. 49 at 11. *See also* Ill. Admin. Code § 1425.10 ("A license or registration issued by the [ICC] to a motor carrier of property has force and effect only while the carrier is in compliance with requirements for the filing of proof of insurance or bond coverage."). Drivers must have a copy of the carrier's license with them at all times. *See* 625 ILCS 5/18c-4104(c). It is a Class C misdemeanor offense, punishable by imprisonment for up to 30 days and a fine of up to $1,500, for an operator not to produce proof of registration upon request (*id.;* 625 ILCS 5/18c-1704(1); 730 ILCS 5/5-4.5-65); and the ICC also has the authority to impose a civil penalty of between $100 and $1,000 per offense (625 ILCS 5/18c-1704(2)). Each day of continuous operation in violation of the licensing requirement constitutes a separate offense. 625 ILCS 5/18-1701.

Each of the three appellants is a motor carrier engaged in the intrastate transportation of property in Illinois that was cited by the ICC police force for conducting such activity without a license. Nationwide Freight Systems, Inc. and Stott Contracting, Inc. were cited in May of 2010 and were each fined $750. Leader U.S. Messenger, Inc., which previously had obtained a license but had allowed it to lapse, was cited in

March of 2011 and was subjected to a civil penalty of $200.[1] After those penalties were paid, the ICC opened investigations into each carrier in order to determine the extent to which the operator may have committed additional violations by conducting unlicensed, intrastate operations for hire prior to the occasion on which the operator was cited. Toward that end, each carrier was asked to produce, for a period of five or six months preceding the violation, documents (including, but not limited to, bills of lading,[2] driver logs, and invoices from any owner/operators leased to the carrier) that would show the dates of transport, a description of the cargo carried, the origin and destination of that cargo, and the revenues generated from the transportation provided. The authorization for these requests is supplied by section 1703 of the Illinois Commercial Transportation Law: "Authorized employees of the Commission shall have the power at any and all times to examine, audit, or demand production of all accounts, books, memoranda, and other papers in the possession or control of a license or registration holder, its employees, or agents." 625 ILCS 5/18c-1703(2)(b).[3] All three carriers refused to comply with the

---

[1]   Of the three appellants, only Nationwide thereafter corrected the deficiency for which it was cited by obtaining a license.

[2]   Bills of lading typically both acknowledge the receipt of goods by the carrier for shipment and recite the terms of the parties' agreement. *See Ill. Match Co. v. Chicago, R.I. & P. Ry. Co.*, 95 N.E. 492, 493-94 (Ill. 1911); *Marx Transp., Inc. v. Air Exp. Int'l Corp.*, 882 N.E.2d 1281, 1286-87 (Ill. App. Ct. 2008); BLACK'S LAW DICTIONARY 198-99 (10th ed. 2014).

[3]   There is no dispute here that the Commission's power extends to motor
(continued...)

ICC's demand for such documents and were issued administrative citations for their refusals. *See* 625 ILCS 5/18c-4401(k).

The carriers filed motions to dismiss these citations with the ICC. They argued that the document requests were preempted by the FAAAA because they sought records that would reveal the rates, routes, or service of each carrier. "To the extent that the commerce commission's minions are asking for information about such things as bills of lading, owner-operator contracts, and any other documents concerning the origins or destinations of cargo, they are running afoul of clearly-stated federal law," they argued. "Their conduct should be barred and sanctioned." *See* R. 1-1 at 6-7 (Stott); R. 44-4 at 5-6 (Nationwide).

The enactment of the FAAAA extended the 1978 preemption of state regulation of air carriers to motor carriers. Pursuant to the FAAAA's preemption provision, neither a state nor its political subdivision may enact or enforce laws "*related to* a price, route, or service of any motor carrier … with respect to the transportation of property. 49 U.S.C. § 14501(c)(1) (emphasis ours). The provision also contains a number of exceptions. As relevant here, the act specifies that the preemption provision does not displace "the authority of a State to regulate motor carriers with regard to minimum amounts of financial

---

[3] (...continued)
carriers of property that should be, but are not, licensed to conduct operations in Illinois. We note that the Commission also has the power under section 1703 to subpoena information from persons other than license holders in furtherance of its inquiry into potential violations. *See* § 18c-1703(2)(b).

responsibility relating to insurance requirements or self-insurance authorization." § 14501(c)(2)(A).

The ICC's chief administrative law judge ("ALJ"), Latrice Kirkland-Montague, denied the carriers' motions to dismiss, found each in violation of its obligation to comply with the Commission's document requests, and ordered each of them to pay fines of $500 for the failure to comply. The carriers filed a consolidated petition for rehearing with the ICC, and Judge Kirkland-Montague issued a memorandum to the ICC's commissioners explaining why, in her view, the petition should be denied. First, the carriers had made no showing that the document requests might have anything more than an indirect, remote, or tenuous effect on their rates, routes, or services. The Commission had only asked the carriers to produce records already in their possession. Second, the statute exempts from preemption the state's power to regulate carriers with respect to minimum insurance requirements. Without the ability to demand the types of records that the ICC had sought from the carriers, Kirkland-Montague asserted, the state would be unable to ascertain whether a carrier was or is operating without a license or without the insurance coverage necessary to obtain a license. R. 44-3 at 45-46. The Commission denied the carriers' petition for rehearing.

The carriers turned to federal court, where they filed suit against the ICC and three of its officers and agents in their official capacities. (The ICC was dismissed from the suit on Eleventh Amendment grounds, and that decision is not challenged here.) The carriers sought a declaratory judgment deeming the ICC's document requests and its investigations preempted by the FAAAA to the extent they implicated the

carriers' rates, routes, or services. "The fact is," the carriers alleged, "that the Interstate Commerce Commission is attempting to regulate—by investigating—a motor carrier's rates, routes, or services for purposes which are preempted by 49 U.S.C. § 14501. That it cannot do." R. 1 at 7 ¶ 27. They also sought an injunction barring the ICC from assessing penalties for their refusal to comply with the document requests and from making any further inquiry into any aspect of their operations other than their compliance with the ICC's insurance requirements or demonstrated safety issues.

The parties filed cross-motions for summary judgment. In connection with those motions, acting ICC police chief Craig Baner submitted a declaration in which he represented that the ICC typically opens an investigation when a commercial motor carrier is discovered to be operating without a public carrier certificate. The purpose of that investigation is to determine how long the carrier has been conducting operations without such a certificate in the time period preceding that violation, and also to determine whether the carrier had the requisite insurance coverage (and had proof of such coverage on file with the ICC) during that same time period. In seeking a carrier's business records, Baner averred, the ICC has no interest in regulating a carrier's prices, routes, or services. Its sole purpose in seeking the types of documents demanded of the carriers in this case is to enforce the certification and insurance requirements imposed on the carriers by Illinois law, and to determine the nature of any additional penalties the ICC may impose on the carrier for violations of those requirements. R 44-9 at 3 ¶¶ 3-5. For their part, the plaintiff carriers were somewhat vague as to how the document requests might affect

their rates, routes, or services. They suggested that the practical result of the ICC's investigation might be to require a carrier and its customers to prepare particular forms responsive to the ICC's demands for information and thereby incur additional costs or, alternatively, face additional penalties if they did not. R. 42 at 5.

The district court granted summary judgment in the ICC's favor. To the extent that the document requests could be construed "[a]t a broad level" to relate to a carrier's rates, routes, or services in the sense of having some connection with them, 2013 WL 5346450, at *6, this alone was insufficient to trigger preemption, the court reasoned. Rather, the challenged conduct must "have 'a *significant* impact on carrier rates, routes, or services'" to be preempted. *Id.*, at * 7 (quoting *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 375, 128 S. Ct. 989, 997 (2008) (emphasis in *Rowe*)). The court had been presented with no evidence that the document requests affected the plaintiffs' rates, routes, or services in any way, and the plaintiffs did not claim that they did. *Id.* The carriers could do no more than speculate that the ICC's document requests might force them to create new forms in order to supply the sort of information that the ICC demanded; but that speculation was not supported by the record. *Id.* Consequently, the carriers had no basis for claiming that the ICC's effort to obtain the challenged documents from the plaintiffs was preempted.

Alternatively, the ICC's pursuit of documents was covered by the statutory exemption for activities aimed at enforcing carrier financial responsibility. *Id.*, at *8. Baner's declaration indicated that the ICC sought the documents in order to

determine how long each carrier had been operating without the requisite certificate, whether the carrier had the requisite insurance coverage during that time, and, if so, whether the carrier had proof of its coverage on file with the ICC during that time. There was no indication that Baner's explanation for the document requests was false. *Id.* The carriers' argument that the document requests were not, in fact, focused on insurance or safety issues was unpersuasive in light of the information actually sought by the request—including the origin, nature, and destination of cargo transported, the dates of transportation, and so forth—and Baner's explanation that this information was sought in order to ascertain how long the carriers may have been operating without a license and, in turn, the requisite insurance. "As a matter of common sense, this type of information is relevant to ascertaining whether a motor carrier is properly licensed and insured." *Id.*

## II.

We are presented on appeal with essentially the same two issues presented to the district court. First, we must consider whether the ICC's investigation "relate[s] to" the plaintiff carriers' rates, routes, and services, and is therefore preempted by the FAAAA, because the Commission has demanded documents which will disclose those rates, routes, and services, absent any additional indication that the Commission's investigation will have a significant economic impact on the carriers' rates, routes, and services. Second, we must consider whether the Commission's document requests fall within the FAAAA's exception for state insurance requirements, given that the requests are not confined to documents reflecting whether and when the carriers were insured and had proof of

their insurance on file with the ICC. We review the district court's resolution of these issues on summary judgment *de novo. E.g., Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *see also Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 17 (1st Cir. 2014) ("Since federal preemption is a question of statutory construction, we review these issues de novo.").

### A.  Connection Between the ICC's Document Requests and the Carriers' Rates, Routes, and Services

The plaintiff carriers contend that the FAAAA bars an investigation into the operations of a motor carrier whenever that investigation, however incidentally, touches upon a carrier's rates, routes, or services with respect to the transportation of property. In the exercise of its audit authority, the ICC has sought documents which will disclose a carrier's rates, routes, and services with respect to the transportation of property; and to that extent, the ICC's investigation arguably "relates to" those rates, routes, and services, as the district court acknowledged. 2013 WL 5346450, at *6. This, in the carriers' view, is enough to demonstrate that the Commission's investigation (including, in particular, the document requests) is preempted, notwithstanding the ICC's unchallenged representation that it seeks these documents solely for purposes of determining how long each carrier may have been operating without the requisite license (and potentially without the insurance coverage needed to obtain such a license) and determining appropriate penalties, and not with any intent to regulate a carrier's rates, routes, or services. They argue:

> When coupled with the Illinois Commerce Commission's demands for transportation-related documents, the admission by the commission that it was seeking information about how long the motor carriers were operating (that is, providing services) without licenses is as clear an indication as any that the commission was investigating the rates, routes and services of motor carriers.

Appellants' Br. 16. This is an exceedingly broad view of preemption principles that finds no support in case law.

The Supremacy Clause of the Constitution establishes a rule of decision precluding courts from "giv[ing] effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 2015 WL 1419423, at *3 (U.S. Mar. 31, 2015); *see* U.S. Const. Art. VI, cl. 2. Of the three recognized types of preemption, *see, e.g.*, *Wigod v. Wells Fargo Bank, N.A*, 673 F.3d 547, 576 (7th Cir. 2012), it is express preemption that is at issue in this case, as the FAAAA states explicitly what states may and may not do with respect to motor carriers of property. Our inquiry into whether the FAAAA preempts the ICC's investigation and document requests consequently begins with the language of the statute, "which necessarily contains the best evidence of Congress' pre-emptive intent." *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1778 (2013) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 1737 (1993)).

Congress enacted the FAAAA's preemption provision in 1994 with the aim of eliminating the patchwork of state regulation of motor carriers that persisted fourteen years after it had first attempted to deregulate the trucking industry. *See*

*Dan's City*, 133 S. Ct. at 1775 (citing *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 440, 122 S. Ct. 2226, 2236 (2002)); *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 548-49 (7th Cir. 2012). Borrowing language from the 1978 legislation deregulating the airline industry, *see Dan's City*, 133 S. Ct. at 1775, Congress precluded any state or its political subdivision from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any private motor carrier … with respect to the transportation of property." 42 U.S.C. § 14501(c)(1).

Thus, as is typical in preemption cases, this appeal focuses on whether the Commission's attempt to enforce the Illinois licensing requirement reasonably can be said to "relate[ ] to" the plaintiff motor carriers' rates, routes, or services. *See, e.g.*, *Dan's City*, 133 S. Ct. at 1778; *S.C. Johnson*, 697 F.3d at 549. "The ordinary meaning of these words is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,'—and the words thus express a broad pre-emptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 2037 (1992) (citation omitted); *see also Dan's City*, 133 S. Ct. at 1778; *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 370, 128 S. Ct. 989, 994-95 (2008). The universe of state regulatory efforts preempted by the FAAAA thus includes laws or actions having some type of connection with or reference to a carrier's rates, routes, or services, whether direct or indirect. *Dan's City*, 133 S. Ct. at 1778 (citing *Rowe*, 552 U.S. at 370, 128 S. Ct. at 995); *see also Morales*, 504 U.S. at 384, 112 S. Ct. at 2037). But "the sky is [not] the limit." *Dan's City*, 133 S. Ct. at 1778. A state's

regulatory action is not preempted where its relationship with carrier rates, routes, or services is "tenuous, remote, or peripheral." *Id.* (citing *Rowe*, 552 U.S. at 371, 128 S. Ct. at 995); *see also Morales*, 504 U.S. at 390, 112 S. Ct. at 2040). Rather, state action must have a substantial economic effect on carrier rates, routes, or services in order to be subject to preemption. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1431 (7th Cir. 1996); *see also Rowe*, 552 U.S. at 375, 128 S. Ct. at 997 ("we have written that the state laws whose 'effect' is 'forbidden' under federal law are those with a '*significant* impact' on carrier rates, routes, or services") (quoting *Morales*, 504 U.S. at 388, 390, 112 S. Ct. at 2039, 2040) (emphasis in *Rowe*).

We have thus articulated two requirements for preemption. First, a state must have enacted or attempted to enforce a law. Second, that law must relate to carrier rates, routes, or services "either by expressly referring to them, or by having a significant economic effect on them." *Travel All Over the World*, 73 F.3d at 1432 (citing *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228-29, 115 S. Ct. 817, 823-24 (1995)); *S.C. Johnson*, 697 F.3d at 553; *see Morales*, 504 U.S. at 388, 112 S. Ct. at 2039; *see also, e.g.*, *Mass. Delivery Ass'n*, 769 F.3d at 17-18; *Parise v. Delta Airlines, Inc.*, 141 F.3d 1463, 1465-66 (11th Cir. 1998).

Without doubt, the state's regulatory efforts satisfy the first of these two criteria. The licensing requirement imposed by section 4104 of the Illinois Commercial Transportation Law, which the ICC was attempting to enforce by way of the document request promulgated pursuant to section 1703 of the statute, applies to motor carriers of property. But does the Commission's enforcement effort meaningfully "relate to"

carrier rates, routes, or services? We agree with the district court that it does not, as the economic impact of the document requests on rates, routes, or services is, if anything, insignificant.

The Illinois statute does not expressly refer to rates, routes, or services, nor does it betray an effort to regulate their operations in any way. It simply imposes a licensing requirement on all motor carriers transporting property within the state and subjects a carrier to penalties for failure to comply with that requirement.

Nor, for that matter, do the challenged document requests expressly refer to rates, routes, or services. It is undisputed that the aim of those requests was to obtain documents that would establish how many times the plaintiff carriers had conducted unlicensed–and potentially uninsured–operations during the time period preceding their citations for operating without the required certificate. The only sense in which the requests implicate rates, routes, or services is that the business records sought (for example, invoices) will necessarily disclose information about the transportation services that a carrier has provided to its customer and the prices charged for those services. It is by no means unusual for one type of record to disclose a variety of information; for that matter, one piece of data can be informative and relevant in any number of ways. Documents which illuminate how many times a carrier engaged in unlicensed operations, how many miles of Illinois roads it used in those operations, and so forth will necessarily touch upon and overlap with the carrier's rates, routes, and services, yes, but the Commission was not interested in the plaintiffs' rates, routes, and services as such.

The district court accepted the notion that the document requests could be said to relate to the carriers' rates, routes, and services in the limited sense that they call for production of records that will disclose their prices, routes, and services. But in the absence of evidence that the ICC's investigation would have any meaningful impact on the carriers' rates, routes, or services, the court concluded that *Travel All Over the World*'s second criterion—that the enforcement effort have a significant economic effect on rates, routes, or services—had not been met.

Indeed, the carriers have never been able to demonstrate how the ICC's document requests might meaningfully affect their rates, routes, or services. As below, they can only speculate that the need to document their compliance with the ICC's registration and insurance requirements might compel the carriers and their customers to generate extra paperwork and thereby increase costs by some indefinite amount. But the ICC has not demanded that the carriers create any particular type of form; the Commission has asked the carriers to produce the types of documents that one would expect to be found among any motor carriers' existing business records. The notion that compliance with the document requests would require the carriers to modify and expand their record-keeping is pure speculation, and is certainly insufficient to demonstrate a significant economic impact on the carriers' operations.[4]

---

[4]   At points in their briefs and arguments to this court, the carriers have suggested that the test for preemption is whether the challenged state action relates to or has a significant impact on carrier rates, routes and services. *See*

(continued...)

The carriers are thus left with the contention that *any* nexus between the challenged state action and their rates, routes, and services–including investigatory actions which would result in the disclosure of their rates, routes, and services– is sufficient to trigger preemption, however minimal the connection might be, and that our own decision in *Travel All Over the World* erred in requiring a showing of a *significant* economic impact. But the Supreme Court has never indicated that a *de minimis* impact on rates, routes, or services suffices for purposes of preemption, and we believe *Travel All Over the World* is in fact consistent with the high Court's cases on this point.

The Supreme Court's preemption precedents are clear that not any relationship between state law and carrier rates, routes, and services, no matter how insignificant, will necessarily result in preemption. The cases do acknowledge that a state statute or effort to enforce that statute need not expressly cite

---

[4] (...continued)

Reply Br. at 4; Oral Argument at 4:29 ("There's two prongs to this statute: to relate to, or to have an effect on."). Actually, "related to" is the single, broad statutory standard, which this court (among others) has deemed to preclude a state from enacting or enforcing a law that: (1) expressly references rates, routes, and services, or (2) has a significant economic impact on rates, routes, and services. *See Travel All Over the World*, 73 F.3d at 1432; *see also Morales*, 504 U.S. at 388, 112 S. Ct. at 2039; *Mass. Delivery Ass'n*, 769 F.3d at 17-18. The carriers seem to be attempting to create a third category of preempted state laws or enforcement actions which *implicitly* reference, without significantly affecting, rates, routes, or services. Our cases do not recognize such a third category. Moreover, as we explain below, neither the Supreme Court's jurisprudence nor our own support the notion that an implicit reference to or connection with carrier rates, routes, or services is alone sufficient to trigger preemption.

a carrier's rates, routes, or services, and that state regulatory action may be preempted as long as it affects a carrier's rates, routes, and services, even if the effect is indirect. *E.g.*, *Dan's City*, 133 S. Ct. at 1778; *Rowe*, 552 U.S. at 370-71, 128 S. Ct. at 995; *Morales*, 504 U.S. at 386, 112 S. Ct. at 2038. Even so, *Dan's City* observes that, notwithstanding the broad preemptive reach of the FAAAA's "related to" clause, "the sky is [not] the limit," and a "tenuous, remote, or peripheral" impact will not trigger preemption. 133 S. Ct. at 1778. The plain import of this qualifying language is that the challenged statute or regulatory action must have a meaningful impact in order to be preempted. To be fair, the Supreme Court has not yet had occasion to identify precisely what types of effects will be too insignificant to trigger preemption, because the cases that the Court has decided under the airline and motor carrier preemption statutes have not been close to the line, wherever that line may be. *See S.C. Johnson*, 697 F.3d at 552 (citing *Rowe*, 552 U.S. at 371, 128 S. Ct. at 995). But whatever room this may leave for the plaintiff carriers to argue that the mere disclosure of their rates, routes, and services is enough of an effect to trigger preemption of the ICC's document requests, *Travel All Over the World* all but closes the door on such a contention. *Travel All Over the World* draws the line to exclude from preemption actions which may have some nominal, incidental connection with carrier rates, routes, or services but do not have a meaningful economic impact on them. 73 F.3d at 1432. We can find nothing in the Supreme Court's cases that is inconsistent with our holding on that point. Indeed, we cannot help but wonder why the Court would continue to caution that a "tenuous, remote, or peripheral" relationship between state regulation

and a carrier's rates, routes, or services does not trigger preemption if it did not mean to imply exactly what our decision in *Travel All Over the World* recognizes: that the challenged state action must have a discernible and substantial impact on a carrier's rates, routes, or services in order to be deemed preempted. *Rowe* itself states that "the state laws whose 'effect' is 'forbidden' are those with a '*significant* impact' on carrier rates, routes, or services." 552 U.S. at 375, 128 S. Ct. at 997 (quoting *Morales*, 504 U.S. at 388, 390, 112 S. Ct. at 2039, 2040) (emphasis in *Rowe*); *see also, e.g., Mass. Delivery Ass'n*, 769 F.3d at 18 ("[C]ountless state laws have *some* relation to the operations of [motor carriers] and thus *some* potential effect on the prices charged or services provided. State laws whose effect is only tenuous, remote, or peripheral are not preempted.") (internal quotation marks and citations omitted) (emphasis in original). And we are confident that wherever the Supreme Court may ultimately draw the line between preempted and non-preempted effects, this case falls on the non-preempted side of the line.

All that the carriers have shown, in the end, is that the Commission's document requests will require them, incidentally, to disclose information regarding their rates, routes, and services, not that the aim or the result of the investigation will be to affect those aspects of their operations. The carriers' speculation concerning extra paperwork at best suggests a *de minimis* (potential) economic effect on their operations in the form of unspecified paperwork. And despite the carriers' insinuation that if the ICC is requesting documents that will reveal their rates, routes, and services, the Commission must have an agenda to influence those aspects of their operations,

there is no indication that the Commission is interested in their rates, routes, or services as such, let alone that it intends to (or necessarily will) regulate or otherwise affect them.

We confronted a similar line of argument when S.C. Johnson & Son sued motor carriers that had allegedly bribed the company's transportation director to contract with them to provide transportation services to the company. S.C. Johnson had alleged, among other things, that the bribery had injured it by increasing the company's transportation costs—*i.e.*, the price it had paid to the carriers for their services. The carriers cited this allegation as "the smoking gun that proves that S.C. Johnson's claims are 'really' just about rates and services." 697 F.3d at 559. We rejected the argument as to S.C. Johnson's bribery and racketeering claims, reasoning that although the injury that S.C. Johnson experienced as a result of the defendants' alleged criminal acts might have some relation to the carriers' rates or services, the relationship was too tangential to warrant preemption. *Id.* at 560. Our decision in that case makes clear that simply because a carrier can show some link between the state action it challenges and its rates, routes, or services does not invariably mean that the challenged action is preempted as one "related to" those rates, routes, or services. The nexus must be significant, and in this case the carriers have no evidence to show that it is.

Finally, it should be noted that the records the ICC has asked the carriers to produce are of a type that might be sought in any number of civil and criminal settings. A customer suing a motor carrier for theft, for example, might ask for these same records, perhaps to establish a pattern of wrongdoing (and other potential victims), to identify the errant driver responsi-

ble for the theft(s), or to trace the path the victim's property took after it was stolen. The state itself might seek to subpoena such records, and for similar purposes, in the course of investigating potential criminal charges of theft, bribery, racketeering, or tax evasion in connection with a carrier's operations. To say that the ICC's requests are preempted simply because the documents they seek will disclose the carriers' rates, routes, and services would call into question any number of legitimate requests for a motor carrier's business records, even when those records are being sought for purposes entirely unrelated to the deregulatory purposes of the FAAAA. Motor carriers, as members of the public, *see S.C. Johnson*, 697 F.3d at 558 (citing *Rowe*, 552 U.S. at 375, 128 S. Ct. at 997), remain subject to the civil and criminal constraints that "set basic rules for a civil society," *id.* at 558. But, as a practical matter, those rules would be unenforceable against motor carriers if such carriers were deemed exempt even from routine investigatory efforts that would result in incidental disclosures of their rates, routes, or services, notwithstanding the absence of any purpose to interfere with the competitive forces of the free market. This is the unmistakable import of the carriers' reply brief, which flatly argues that any effort to document and fine a carrier based on the number of days it has conducted unlicensed operations is preempted by the FAAAA. Reply Br. at 6.

## B. Safety and Insurance Exception

Even if it could be said that the ICC's investigation meaningfully relates to the carriers' rates, routes and services, the district court correctly determined that the Commission's enforcement actions fall within the exception to preemption set

forth in the insurance provision of the FAAAA. The statute provides that the general rule of preemption set forth in section 14501(c)(1) "shall not restrict the safety regulatory authority of a State with respect to motor vehicles … or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization." § 14501(c)(2)(A). As the district court recognized, "[t]his exception preserves 'the preexisting and traditional state police power over safety,' and state laws that are 'genuinely responsive to safety [or insurance] concerns' are included within the exception." 2013 WL 5346450, at *8 (quoting *Ours Garage*, 536 U.S. at 439, 442, 122 S. Ct. S. Ct. at 2236, 2237). Because it is fair to say that the ICC's investigation was aimed at enforcing Illinois' requirement that carriers maintain specified insurance coverage, the Commission's investigation is covered by this exception.[5]

It is undisputed that the one substantive requirement that a motor carrier must satisfy in order to obtain the requisite

---

[5] The carriers devote significant attention in their briefs to contesting the notion that the ICC's investigation was motivated by safety concerns. Among other things, they point out that the ICC's former responsibilities for conducting safety inspections of the vehicles used by motor carriers have been transferred to the Illinois Department of Transportation. *See* 20 ILCS 2705/2705-125. But setting safety concerns aside, there nonetheless remains the express exemption for regulation of "motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements." § 14501(c)(2)(A); *see Cal. Tow Truck Ass'n v. City & Cnty. of San Francisco*, 693 F.3d 847, 857-58 (9th Cir. 2012) (identifying these as separate exceptions). It is this statutory exception on which the ICC relies, and on which we shall focus our attention.

license from the ICC is to show that it has appropriate insurance or bond coverage; beyond that, it is simply a matter of completing paperwork and submitting a fee.[6] Requiring a license is thus a means of confirming that motor carriers are properly insured. Indeed, as we noted earlier, the public carrier certificate issued to an intrastate motor carrier memorializes the license holder's certification "that it will perform transportation activities only with the lawful amount of liability insurance in accordance with 92 Ill. Admin. Code 1425." R. 49 at 11. And penalizing a carrier for conducting unlicensed operations (and conducting an investigation to determine the extent of such operations for purposes of determining the appropriate penalty) likewise furthers the insurance requirement. Thus, the ICC's investigation fits comfortably within section 14501(2)(A)'s exception for imposing and enforcing insurance requirements vis-à-vis commercial motor carriers of property. *Cf. Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 776 (2d Cir. 1999) (remarking, with respect to municipal regulations as to "licensing, display of information, reporting, record-keeping, criminal history, insurance, posting of bond, and maintenance of storage and repair facilities" of tow-truck operators: "Most of these requirements are so directly related to safety or financial responsibility and impose so peripheral and incidental an economic burden that no detailed analysis is necessary to conclude that they fall within the § 14501(c)(2)(A) exemptions.").

---

[6] The minimum amounts and types of insurance coverage are specified by the Illinois Administrative Code. *See* 92 Ill. Admin. Code §§ 1425.30-1425.50; *see also id.* § 1425.120 (specifying minimum net worth requirements for carrier to qualify for self-insurance).

The carriers suggest that if the Commission were truly interested in insurance, it would simply ask the carriers about their coverage and leave it at that. But when a carrier has been cited for operating without a license, as each of these carriers was—presenting the possibility that the carrier was also operating without appropriate insurance coverage—the Commission is not required to take the carrier at its word for how long it may have been out of compliance with the ICC's requirements. It may legitimately seek to establish, independently, to what extent the carrier has engaged in unlicensed operations–*i.e.*, how many operations it has conducted over Illinois roads without a license. This is the obvious point of the ICC's document requests, and we are given no reason to believe that its requests were a subterfuge for something else, including in particular an effort to affect the carrier's rates, routes or services.

On this point, it bears emphasizing that the carriers have consistently refused to acknowledge the stated purpose for which the ICC has sought the requested documents, which is to document the *extent* of the carriers' intrastate operations in violation of Illinois' licensing and insurance requirements. The carriers seem to assume that the Commission has no need to know anything beyond the fact that a particular carrier was or was not licensed and insured. But, as the ICC has argued without contradiction, the extent of a carrier's unlicensed and potentially uninsured operations factors into the magnitude of the penalty that the Commission will impose for such operations. Recall that each day of continuous operation in violation of the licensing requirement constitutes a separate violation of the Illinois Commercial Transportation Law. 625 ILCS 5/18c-

1701. And the Commission's regulations state expressly that the extent of a carrier's violative conduct affecting the public interest is a factor bearing on the civil penalties that the Commission may impose. *See* 92 Ill. Admin. Code § 1440.10(d). The records sought by the ICC thus have an obvious relevance to what additional penalties ought to be imposed on the carriers for their unlicensed operations.[7] To assert, as the carriers do implicitly, that the Commission does not need to know how many trips a carrier has made or how much cargo it has transported while it was unlicensed and/or without appropriate insurance coverage is to suggest that all delinquent carriers should be treated alike; that a carrier which has conducted only five unauthorized trips in a particular time period should be assessed the same penalty as a carrier which has conducted hundreds of such unauthorized trips, for example. This defies common sense, and is inconsistent with the state statutory scheme.

The carriers go so far as to suggest that any inquiry attempting to ascertain the total number of unlicensed operations they conducted in Illinois represents the very "kind of economic regulation that Congress intended to bar when it passed the FAAAA" and that treating each day of unlicensed operation as a separate violation of Illinois law "is nothing more than economic regulation." Reply Br. at 5-6. Why they

---

[7] *Cf. Nussbaum Trucking, Inc. v. Ill. Commerce Com'n*, 425 N.E.2d 1229, 1233-34 (Ill. App. Ct. 1981) (in ICC proceeding on petition to approve purchase of motor carrier of property, abstracts of representative shipments were competent and admissible to establish that carrier's operations had not been abandoned, suspended, discontinued, or left dormant).

believe this is so is not clear. We are aware of no case holding that a state may not require a motor carrier of property doing business within its borders to be licensed by that state, particularly when licensing is the state's means of ensuring that the carrier is appropriately insured. Nor are we convinced that a system of penalties proportionate to the extent of a motor carrier's unauthorized operations could have anything more than a tangential effect on the carrier's rates, routes, or services. The services a carrier has provided while unlicensed will inform whatever penalty the ICC later chooses to impose, but that penalty logically would not restrain, influence, or otherwise affect the carrier's choice of rates, routes, or services thereafter. Once the penalty is paid and a license is secured, the carrier is free to provide whatever services it wishes, at the rates it believes appropriate and over the routes of its choosing.[8] A proportionate penalty surely will discourage the carrier from ignoring the licensing requirement in the future, but if the licensing requirement itself is permissible, as we are certain it is, then so too is this salutary effect.

---

[8] A hefty fine certainly could put a dent in a carrier's finances, and perhaps the carrier might seek to charge its customers more (the market permitting), or otherwise modify its rates, routes, or services in an effort to repair the damage to its balance sheet. We very much doubt that this could be characterized as anything more than a tangential effect on the carrier's rates, routes, and services for purposes of the preemption analysis. *Cf. S.C. Johnson*, 697 F.3d at 559-60 (alleged bribery conspiracy's effect on rates customer was charged for carrier's services insufficient to show customer's bribery and racketeering claims were preempted). In any event, the carriers do not make this particular argument.

Promoting financial responsibility by requiring that motor carriers operating within a state's borders maintain appropriate insurance is an area that Congress has expressly reserved to the states; and a licensing regime akin to the one Illinois has established is an obvious and logical way to enforce its insurance requirements. The type of document requests that the ICC has issued to the carriers is also precisely the sort of discovery in which one would expect an agency to engage in order to assess the extent and gravity of a carrier's non-compliance with the licensing requirement and to assess a proportionate penalty. We are satisfied that the challenged requests fall within the scope of the exception that Congress has established.

### III.

For the foregoing reasons, we AFFIRM the grant of summary judgment in favor of the defendants-appellees.