In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-1805

YING YE, as Representative of the Estate of SHAWN LIN, deceased,

*Plaintiff-Appellant,*

*v.*

GLOBALTRANZ ENTERPRISES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-CV-01961 — **Elaine E. Bucklo**, *Judge.*

ARGUED DECEMBER 5, 2022 — DECIDED JULY 18, 2023

Before BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* This appeal presents a question of preemption under the Federal Aviation Administration Authorization Act. Ying Ye seeks to recover against GlobalTranz Enterprises, a freight broker, following the death of her husband in a highway accident. Ye claims GlobalTranz negligently hired the motor carrier that employed the driver of the truck that caused the accident. The district court concluded

both that the Act's express preemption provision in 49 U.S.C. § 14501(c)(1) bars Ye's claim and that the Act's safety exception in § 14501(c)(2)(A) does not save the claim. We agree and affirm.

**I**

GlobalTranz is a freight broker that provides transportation logistics services to parties seeking to ship goods. In 2017 a company contacted GlobalTranz to provide such services for goods to be transported from Illinois to Texas. Global-Tranz hired the motor carrier Global Sunrise, Inc. to provide that shipping service. This arrangement meant that Global Sunrise provided the driver and vehicle to complete the shipping.

On November 7, 2017, the truck completing that shipping route, driven by a Global Sunrise employee, collided with a motorcycle driven by Ying Ye's husband, Shawn Lin, on an interstate highway near Conroe, Texas. Lin sustained serious injuries and died two weeks later.

As Lin's surviving spouse, Ye brought a diversity suit against Global Sunrise in its capacity as the motor carrier that employed the truck driver involved in the crash. Ye brought two Illinois tort claims—one for negligent hiring and another for vicarious liability—against the motor carrier.

Ye later amended her complaint to add two Illinois tort claims against GlobalTranz for its role as the broker that hired Global Sunrise. Ye's first claim—negligent hiring—alleged that GlobalTranz "was negligent in selecting Global Sunrise Inc. to transport freight on its behalf as they knew, or should have known, that Global Sunrise Inc. was an unsafe company with a history of hours of service and unsafe driving

violations that would've alerted a reasonably prudent person to the same" and that this negligence proximately caused Lin's death. Ye's second claim—vicarious liability—alleged that GlobalTranz "exercised sufficient control over Global Sunrise" such that GlobalTranz "is vicariously liable for the negligence of Global Sunrise" and its driver.

Counsel for Global Sunrise withdrew from the litigation in May 2019. After more than two years passed without entry of new counsel, Ye moved for default judgment. The district court granted Ye's motion and entered default judgment against Global Sunrise on both of Ye's claims against the motor carrier. Following a hearing in April 2022, the court awarded Ye $10 million in survival damages and wrongful-death damages against Global Sunrise. No aspect of this appeal relates to Ye's claims against Global Sunrise.

Meanwhile, Ye continued to litigate her separate claims against GlobalTranz. In November 2019 GlobalTranz moved to dismiss the claims, which the district court construed as a motion for judgment on the pleadings. The district court granted the motion as to Ye's negligent hiring claim, finding the claim to be barred by the Federal Aviation Administration Authorization Act. The court determined Ye's negligent hiring claim was prohibited under the Act's express preemption provision in 49 U.S.C. § 14501(c)(1) and not saved by any of the Act's exceptions, including the safety exception in § 14501(c)(2)(A). The court did not dismiss the vicarious liability claim on the pleadings, but after one year of discovery entered summary judgment for GlobalTranz on the merits of that claim.

Ye now appeals the district court's dismissal of her negligent hiring claim against GlobalTranz.

## II

Federal preemption doctrine owes its existence to Article VI of the U.S. Constitution, which makes the Constitution, and federal law enacted pursuant to it, the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. In short, the Supremacy Clause precludes courts from "giv[ing] effect to state laws that conflict with federal laws." *Nationwide Freight Sys., Inc. v. Illinois Com. Comm'n*, 784 F.3d 367, 372 (7th Cir. 2015) (alteration in original) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)).

Today's law recognizes three types of federal preemption: express preemption, field preemption, and conflict preemption. See, *e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 576 (7th Cir. 2012). Given that the Federal Aviation Administration Authorization Act "states explicitly what states may and may not do with respect to" motor carriers and brokers, this case concerns express preemption. *Nationwide Freight*, 784 F.3d at 373. Our task is one of statutory construction—to determine whether Ye's state law claim falls within the Act's express prohibition in § 14501(c)(1) and, if so, whether any of the Act's exceptions save her claim from preemption.

We take a fresh look at Ye's complaint to determine whether the district court correctly dismissed her negligent hiring claim against GlobalTranz. See *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016). In doing so, we owe no deference to the district court's legal determination that the Federal Aviation Administration Authorization Act preempts her claim.

A

In 1994 Congress enacted the Federal Aviation Administration Authorization Act (which the parties call "F Quad A," but which we refer to as the Act) as part of a greater push to deregulate interstate transportation industries. The initial effort began in 1978 with a focus on deregulating domestic air travel. See *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 255–56 (2013). With the passage of the Act in 1994, Congress turned its attention to the trucking industry "upon finding that state governance of intrastate transportation of property had become 'unreasonably burden[some]' to 'free trade, interstate commerce, and American consumers.'" *Id.* at 256 (alteration in original) (quoting *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424, 440 (2002)). The Act includes several provisions barring such burdensome state regulations. See, *e.g.*, 49 U.S.C. § 14501(a)(1), (b)(1), (c)(1).

Ye's appeal requires a close look at the Act's express preemption provision and exceptions in 49 U.S.C. § 14501(c), which governs "Motor Carriers of Property." By its terms, § 14501(c) provides that a state

> may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier … or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1). Several exceptions then follow. See *id.* § 14501(c)(2), (3), (5).

We will come to focus on the so-called safety exception in § 14501(c)(2)(A). Under this exception, the express preemption provision in § 14501(c)(1)

> shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

*Id.* § 14501(c)(2)(A).

Notice, then, the overarching statutory structure: Congress broadly disallowed state laws that impede its deregulatory goals, but it made a specific carveout for laws within a state's "safety regulatory authority … with respect to motor vehicles," even though such laws may burden interstate commerce. See *Ours Garage*, 536 U.S. at 441 (observing that "a State could, without affront to the statute, pass discrete, nonuniform safety regulations" because the Act's preemption provision in § 14501(c)(1) and its safety exception in § 14501(c)(2)(A) achieve different goals).

### B

Interpreting these statutory provisions, the district court first concluded that Ye's negligent hiring claim against GlobalTranz falls within § 14501(c)(1)'s express prohibition on the enforcement of state laws "related to a … service of any …

broker … with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). We agree.

As always, we begin with the Act's text, "which necessarily contains the best evidence of Congress' pre-emptive intent." *Dan's City Used Cars*, 569 U.S. at 260 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). In the preemption context, the Supreme Court understands "related to" or "relating to" as having a "broad preemptive purpose." See *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (interpreting an identical provision of the Airline Deregulation Act); see also *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 370–71 (2008) (explaining that interpretations of the Airline Deregulation Act directly apply to the Federal Aviation Administration Authorization Act). To be "related to" broker services, the state law in question need only have a "connection with, or reference to" these services. *Rowe*, 552 U.S. at 370 (emphasis removed) (quoting *Morales*, 504 U.S. at 384). A state law may be preempted even if the law's effect on broker services "is only indirect." *Id.* (quoting *Morales*, 504 U.S. at 386). But state laws with indirect effects still require a clear, articulable connection. The Act does not preempt state laws that impact broker services in only a "tenuous, remote, or peripheral" manner. *Id.* at 371 (quoting *Morales*, 504 U.S. at 390).

Our court has implemented the Supreme Court's instructions in *Morales* and *Rowe* with a two-part test. As the party seeking to establish preemption, GlobalTranz must show both that a state "enacted or attempted to enforce a law" and that the state law relates to broker "rates, routes, or services 'either by expressly referring to them, or by having a significant economic effect on them.'" *Nationwide Freight*, 784 F.3d at

373–74 (quoting *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996)).

Ye brought her negligent hiring claim against GlobalTranz under Illinois's common law of negligence. Common law tort claims "fall comfortably within the language of the [ ] preemption provision" that, by its terms, "applies to state 'law[s], regulation[s], or other provision[s] having the force and effect of law.'" *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 281–82 (2014) (alterations in original) (citation omitted). So the first preemption requirement is easily met.

The question then becomes whether the Illinois law underlying Ye's claim expressly refers to or has a significant economic effect on broker services. See *Nationwide Freight*, 784 F.3d at 373–74. Nothing in Illinois tort law expressly refers to broker services. Rather, Ye roots her claim in a theory of negligent hiring more generally. Our focus must therefore be on whether Ye's proposed enforcement of Illinois's common law of negligence would have a significant economic effect on broker services.

Like the district court, we conclude the answer is yes. Ye alleges GlobalTranz "was negligent in selecting Global Sunrise Inc. to transport freight on its behalf." As a broker, GlobalTranz offers services in the form of "selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2) (defining "broker"). By its terms, Ye's claim strikes at the core of GlobalTranz's broker services by challenging the adequacy of care the company took—or failed to take—in hiring Global Sunrise to provide shipping services.

In our view, enforcement of such a claim—and the accompanying imposition of liability—would have a significant economic effect on broker services. By recognizing common-law negligence claims, courts would impose in the name of state law a new and clear duty of care on brokers, the breach of which would result in a monetary judgment. This is exactly what Ye seeks here against GlobalTranz. To avoid these costly damages payouts, GlobalTranz and other brokers would change how they conduct their services—for instance, by incurring new costs to evaluate motor carriers. Then, by changing their hiring processes, brokers would likely hire different motor carriers than they would have otherwise hired without the state negligence standards. Indeed, that is the centerpiece of Ye's claim: that GlobalTranz should not have hired Global Sunrise.

In our view, then, Ye's negligent hiring claim has much more than a tenuous, remote, or peripheral relationship to broker services. The relationship is direct, and subjecting a broker's hiring decisions to a common-law negligence standard would have significant economic effects. So Ye's claim is expressly preempted by § 14501(c)(1).

Our conclusion is consistent with the two other circuit courts that have considered this issue. See *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1024 (9th Cir. 2020) ("[A] claim that imposes an obligation on brokers at the point at which they arrange for transportation by motor carrier has a 'connection with' broker services."); *Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1267 (11th Cir. 2023) ("[T]he [Act] makes plain that [the plaintiff's] negligence claims relate to a broker's services.").

Ye's arguments to the contrary are unpersuasive. She contends that the effects of enforcing negligent hiring claims against brokers are too tenuous to be "related to" broker services because negligent hiring laws regulate a broker's broader duty to the public, not its narrower relationships with its customers. Ye insists this public–private distinction is important because she believes that Congress intended to preempt state laws regulating only a broker's market relationships, not a broker's relationship with the public. And she sees GlobalTranz as having breached a duty of care owed to a member of the public—her husband who was killed by a Global Sunrise employee—and not a duty owed to its freight customer.

We find no support in § 14501(c)(1)'s express preemption provision for Ye's position. The purpose of Illinois tort law—whether aimed at a broker's duty to the public or to private actors—has no bearing on the significant economic effects that will result by imposing state negligence standards on brokers. And these significant effects are what matter in determining that § 14501(c)(1) expressly preempts Ye's Illinois tort claim rooted in a theory of negligent hiring. See *Nationwide Freight*, 784 F.3d at 373–76.

C

That brings us to the Act's safety exception. Even if Ye's claim is expressly preempted, it may be saved by one of several provisions excluding claims from § 14501(c)(1)'s broad reach. Ye points us to the safety exception in § 14501(c)(2)(A), which provides that laws within a state's "safety regulatory authority ... with respect to motor vehicles" are not preempted. Here, too, we agree with the district court that the

Act's safety exception does not save Ye's claim from preemption.

To start, Ye asks us to examine the first half of the safety exception's text and conclude that a state's tort law is part of its "safety regulatory authority." There is much to say in support of this argument, and many courts agree with Ye's line of reasoning. See, *e.g.*, *Miller*, 976 F.3d at 1026–29; *Aspen*, 65 F.4th at 1268–70. But we do not need to reach this issue because we conclude that Ye's claim fails to satisfy the second half of the safety exception's text. In short, a common law negligence claim enforced against a broker is not a law that is "with respect to motor vehicles."

1

The Supreme Court has broadly interpreted "with respect to" to mean "concern[s]." See *Dan's City Used Cars*, 569 U.S. at 261. But more crucial to our analysis is Congress's specification limiting the excepted laws to those that concern "motor vehicles." Our focus, then, is on the entire phrase "with respect to motor vehicles"—language the Supreme Court has determined "massively limits the scope" of the safety exception. *Id.* (quoting *Ours Garage*, 536 U.S. at 449 (Scalia, J., dissenting)). We must decide whether Ye's negligent hiring claim is one "with respect to motor vehicles." We conclude it is not because, in our view, the exception requires a direct link between a state's law and motor vehicle safety. And we see no such direct link between negligent hiring claims against brokers and motor vehicle safety.

Once again we start with the statutory text. We first recognize Congress's express use in § 14501(c)(2)(A) of a statutorily defined term—"motor vehicles." By limiting the safety

exception to apply to state laws "with respect to motor vehicles," Congress narrowed the scope of the exception to those laws concerning a "vehicle, machine, tractor, trailer, or semitrailer … used on a highway in transportation." 49 U.S.C. § 13102(16) (defining "motor vehicle"). We see no mention of brokers in the safety exception itself or in Congress's definition of motor vehicles, which suggests that such claims may be outside the scope of the exception's plain text. See *Dan's City Used Cars*, 569 U.S. at 261–62 (concluding that a state's law was not "with respect to transportation of property" under § 14501(c)(1) where it concerned post-towing storage, which does not constitute "transportation" as defined in § 13102(23)(B)).

Looking beyond the clause containing the safety exception, § 14501(c)(2)(A) goes on to preserve a state's authority "to impose highway route controls or limitations based on the size or weight of a motor vehicle or the hazardous nature of the cargo" and to regulate motor carriers' "insurance requirements." Notice the specificity throughout § 14501(c)(2)(A): after broadly preempting state laws related to the prices, routes, and services of brokers and motor carriers in § 14501(c)(1), Congress carefully excepted state laws for motor vehicle safety, cargo loads, and motor carrier insurance.

Now notice what is missing from § 14501(c)(2)(A)—any reference to brokers or broker services. While it listed broker services in § 14501(c)(1)'s express preemption provision, Congress declined to expressly mention brokers again in reference to states' safety authority. Reading further, we see the same omission of brokers from § 14501(c)(2)'s other savings provisions for "intrastate transportation of household goods" and "tow truck operations." *Id*. § 14501(c)(2)(B), (C).

Remember, too, that § 14501(c) sets forth federal authority over "Motor Carriers of Property"—not brokers—so Congress's inclusion of brokers in one subsection and exclusion in another suggests that the omission was intentional. See *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."). Congress could have chosen to save state safety laws enforced "with respect to motor carriers and brokers," but it did not. We hesitate to read broker services into parts of the statute where Congress declined to expressly name them, especially when it contemplated them elsewhere within the same statutory scheme. See *id.* at 360–61 ("It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" (alteration in original) (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012))).

Congress's omission of brokers from the exceptions to § 14501(c)(1)'s preemptive sweep is even more pronounced when we take a step back and examine other provisions within § 14501. What most stands out is § 14501(b), titled "Freight Forwarders and Brokers." In § 14501(b)(1) Congress directly addressed state regulation of brokers by prohibiting states from enacting or enforcing laws "relating to intrastate rates, intrastate routes, or intrastate services of any freight forwarder or broker." Following this broad preemption provision, however, Congress did not include a safety exception—another telling omission given that Congress included safety exceptions to the parallel preemption provisions for motor carriers of property (at issue here) and motor carriers of passengers. See *id.* § 14501(a)(2), (c)(2)(A). Here, too, Congress's decision not to write a safety exception for the broker-specific

preemption provision indicates a purposeful separation be-
tween brokers and motor vehicle safety.

That brings us back to Ye's claim. Absent unusual circum-
stances, the relationship between brokers and motor vehicle
safety will be indirect, at most. No better example than Ye's
complaint. She alleged that GlobalTranz was "negligent in se-
lecting Global Sunrise" as the motor carrier and that Global
Sunrise was the one "negligent in its entrustment of a tractor-
trailer" to an unsafe driver. Ye's allegations mirror practical
realities: GlobalTranz does not own or operate motor vehicles
like Global Sunrise does. Seeing the connection between Glob-
alTranz as a broker and motor vehicle safety requires an extra
link to connect the alleged chain of events: GlobalTranz's neg-
ligent hiring of Global Sunrise resulted in Global Sunrise's
negligent entrustment of a motor vehicle to a negligent driver
who, in turn, caused a collision that resulted in Shawn Lin's
death.

In our view, this additional link goes a bridge too far to
bring Ye's negligent hiring claim against GlobalTranz within
the Act's safety exception in § 14501(c)(2)(A). The Act's text
makes clear that Congress views motor vehicle safety regula-
tions separately and apart from those provisions imposing
obligations on brokers. And this separateness counsels a read-
ing of "with respect to motor vehicles" that requires a direct
connection between the potentially exempted state law and
motor vehicles. Any other construction would expand the
safety exception's scope without a clear, text-based limit. So
we agree with the district court that the connection here—be-
tween a broker hiring standard and motor vehicles—is too at-
tenuated to be saved under § 14501(c)(2)(A).

To be sure, Ye is right to observe that, at a higher level of generality, motor vehicles have some relationship to brokers and, in turn, to considerations of motor vehicle safety. But we do not see how Congress authorized such a broad reading of the safety exception, and Ye offers no limiting principle of her own. It is difficult to conclude that the same Congress that prescribed specific—often itemized—regulations for motor vehicle safety intended something broader than "motor vehicle" in a safety exception that immediately follows an express preemption provision regulating "motor carriers." So we draw the line where Congress did—at state safety regulations directly related to "motor vehicles."

2

Looking beyond § 14501 to the other provisions of Title 49 further reinforces our narrow reading of the phrase "with respect to motor vehicles" in § 14501(c)(2)(A)'s safety exception. See *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("[A] reviewing court should not confine itself to examining a particular statutory provision in isolation [because] [t]he meaning … of certain words or phrases may only become evident when placed in context."); see also *Sackett v. EPA*, 143 S. Ct. 1322, 1338 (2023) (considering the broader context of the Clean Water Act to derive the meaning of "wetlands" in one provision of the Act (citing *Brown & Williamson Tobacco*, 529 U.S. at 132)). We look to Title 49 for the limited purpose of informing our understanding of "motor vehicles" as Congress used the phrase in the Federal Aviation Administration Authorization Act and find that the broader statutory context underscores our conclusion that only state laws with a direct connection to motor vehicles are saved from the Act's express preemption provision.

Where Congress regulates motor vehicle safety in Title 49, it addresses motor vehicle ownership, operation, and maintenance—but not broker services. Take, for instance, Subtitle VI, which covers "Motor Vehicle and Driver Programs." Here Congress defined "motor vehicle safety" to mean "the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle." 49 U.S.C. § 30102(9). Congress went on to give the Secretary of Transportation authority to, among other things, set "standards for inspection of commercial motor vehicles," *id.* § 31142(b); "ensure that commercial motor vehicles are maintained, equipped, loaded, and operated safely," *id.* § 31136(a)(1); and "issue and require the display of an identification plate on a motor vehicle used in transportation," *id.* § 31504(a)(1). These regulations, and many others, concern the ownership and operation of the vehicles themselves—without reference to broker services.

The regulation of motor carriers throughout Title 49 further illustrates the lack of evidence that Congress sees a direct link between brokers and motor vehicles. For example, § 113 created the Federal Motor Carrier Safety Administration and empowered its Administrator to "carry out duties and powers related to motor carriers or motor carrier safety." *Id.* § 113(f)(1). The Administration has imposed standards for commercial motor vehicle drivers' licenses, see 49 C.F.R. § 383.1; operation of motor vehicles, see *id.* §§ 392.3–392.5; and inspection of motor vehicle equipment, see *id.* § 392.7. The regulations apply to motor carriers and their drivers, without mention of brokers or other entities. See, *e.g.*, *id.* § 392.4(b) ("No motor carrier shall require or permit a driver to [drive under the influence of drugs]."). Congress also created a

Motor Carrier Safety Assistance Program to fund state efforts to promote and enforce "effective motor carrier, commercial motor vehicle, and driver safety regulations and practices consistent with Federal requirements." 49 U.S.C. § 31102(b)(3); see also *id.* § 31104. The Program, too, makes specific mention of motor carriers with respect to motor vehicle safety regulation, but not brokers. See 49 C.F.R. §§ 350.101–350.417.

Indeed, we find no evidence in Title 49 that Congress sees a direct relationship between broker services and motor vehicles. Its regulation of brokers instead seems to address the financial aspects of broker services, not safety. For instance, brokers must file a "surety bond, proof of trust fund, or other financial security" with the Secretary of Transportation to secure against any "claim against a broker arising from its failure to pay freight charges under its contracts, agreements, or arrangements for transportation." 49 U.S.C. § 13906(b)(1)(A), (2)(A). Compare that approach with Congress's regulation of the financial security of motor carriers in that same section. Where brokers need only secure against a failure to perform logistics services, motor carriers must obtain liability insurance that covers "final judgment against the [motor carrier] for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles." *Id.* § 13906(a)(1). Put differently, Congress required motor carriers—not brokers—to bear responsibility for motor vehicle accidents.

We see, too, that the Federal Motor Carrier Safety Administration—which is tasked with motor vehicle safety as its top priority—requires brokers to maintain records of their transactions, abide by certain advertising standards, and avoid

conflicts of interest with shippers. See 49 C.F.R. §§ 371.3, 371.7, 371.9. But nowhere do we see any indication that the Administration imposes safety standards on broker hiring or otherwise recognizes a relationship between brokers and motor vehicles.

A clear conclusion emerges from this broader review of Title 49 and the regulatory landscape: Congress's references to motor vehicle safety do not impose obligations on brokers. Accordingly, when it comes to interpreting the Act's safety exception, only those laws with a direct link to motor vehicles fall within a state's "safety regulatory authority ... with respect to motor vehicles." Brokers are noticeably absent from motor vehicle safety regulations throughout the statutory scheme, just as they are absent from the ambit of the safety exception in § 14501(c)(2)(A). Our initial text-based determination therefore remains the same: § 14501(c)(2)(A) requires state laws to have a direct link to motor vehicles to be saved from the preemption provision in § 14501(c)(1).

We thus conclude that Ye's negligent hiring claim against GlobalTranz does not fall within the scope of § 14501(c)(2)'s safety exception. The claim is preempted and therefore properly dismissed by the district court.

**III**

Our conclusion aligns squarely with the Eleventh Circuit's recent decision in *Aspen American Insurance Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261 (11th Cir. 2023).

In *Aspen*, the Eleventh Circuit also considered a negligent hiring claim against a freight broker. Tessco Technologies hired the broker Landstar Ranger to transport cargo. While rendering its services, Landstar mistakenly gave Tessco's

cargo to an entity pretending to be a motor carrier, and the fraudulent entity ran off with Tessco's goods. Tessco was reimbursed by its insurance company, Aspen American Insurance, who in turn brought a state tort claim against Landstar for its negligent selection of the thieving motor carrier. Landstar argued that the Act preempted Aspen's negligent hiring claim. See 65 F.4th at 1264–65.

The Eleventh Circuit first held, as we do here, that negligent hiring claims against brokers are expressly preempted by § 14501(c)(1) under the Supreme Court's broad reading of "related to." See *id.* at 1268 (citing *Morales*, 504 U.S. at 386). The *Aspen* court then went on to analyze the safety exception in § 14501(c)(2)(A). The panel divided over whether to reach the question of whether a state's "safety regulatory authority" includes state tort law, see *id.* at 1273 (Jordan, J., concurring) (declining to reach this issue), but the full panel concluded that negligent hiring claims against brokers are not "with respect to motor vehicles" and therefore not saved by the Act's safety exception. See *id.* at 1270–72.

The court's approach grounded itself in the language of § 14501(c). Using canons of construction to avoid redundancy and surplusage, the court concluded that the "phrase 'with respect to motor vehicles' limits the safety exception's application to state laws that have a *direct* relationship to motor vehicles." *Id.* at 1271 (emphasis in original). In cases of negligent hiring claims against brokers—regardless of whether the injury is lost property (as in *Aspen*) or bodily injury (as here)—the court held that "a mere indirect connection between state regulations and motor vehicles will not invoke the [Act]'s safety exception." *Id.* at 1272.

Our reasoning similarly roots itself in the language Congress employed in § 14501(c)(1) and § 14501(c)(2)(A), and we go one step further by taking a broader look at the surrounding regulatory scheme in the Act and within Title 49 more generally. In the end, then, we join the Eleventh Circuit in holding that § 14501(c)(2)(A) requires a direct link between state laws and motor vehicle safety and that negligent hiring claims against brokers fall short of having that direct link.

The only other circuit court to have considered the issue presented is the Ninth Circuit. The dispute in *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016 (9th Cir. 2020), arose from near-identical facts to those here: Allen Miller sought to recover damages from a freight broker that he alleged was negligent in hiring an unsafe motor carrier whose driver caused a highway accident leaving Miller a quadriplegic. See *id.* at 1020. Consistent with our analysis, the court first held that negligent hiring claims against brokers are expressly preempted by § 14501(c)(1) under its view that "related to" requires a broad construction. See *id.* at 1021–25.

From there, however, the court found Miller's claim against the broker to be saved by the Act's safety exception in § 14501(c)(2)(A). The Ninth Circuit interpreted "with respect to motor vehicles" broadly to support exemption of state laws with an indirect link to motor vehicles, including negligent hiring claims against brokers. See *id.* at 1030–31. We see three major analytical differences that account for our opposing interpretations of § 14501(c)(2)(A).

First, in our view, the Ninth Circuit unduly emphasized Congress's stated deregulatory purpose in passing the Act at the expense of the insights that come from an analysis of the broader statutory scheme. Consideration of congressional

purpose is wholly appropriate. But given the plain meaning and import of the text, both in § 14501(c) itself and throughout the rest of Title 49, we do not see how Congress's deregulatory goals can overcome the clear statutory mandate that the exception in § 14501(c)(2)(A) saves only those safety regulations directly concerning motor vehicles. See *id.* at 1031 (Fernandez, J., concurring in part and dissenting in part) ("[A broker] and the services it provides have no direct connection to motor vehicles or their drivers. … That attenuated connection is simply too remote for the safety exception to encompass [the] negligence claim.").

A second difference is the Ninth Circuit's reliance on a presumption against preemption to resolve any ambiguity in the breadth of the safety exception's scope. See *id.* at 1021. In a later Ninth Circuit case, however, the court acknowledged that its reliance on the presumption against preemption—in *Miller v. C.H. Robinson* specifically—stood in direct conflict with the Supreme Court's instruction to "focus on the plain wording of the clause" instead of "invok[ing] any presumption against pre-emption." *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 553 n.6 (9th Cir. 2022) (quoting *Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. 115, 125 (2016)). Consistent with *Franklin*, we focus on the text of § 14501(c)(2)(A), which is "the best evidence of Congress' preemptive intent," 579 U.S. at 125 (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 594 (2011)), and come to a different outcome than the Ninth Circuit. We cannot be sure how the Ninth Circuit would interpret § 14501(c)(2)(A) absent such a presumption against preemption.

Finally, we disagree with the Ninth Circuit's conclusion that the phrase "with respect to" in § 14501(c)(2)(A) is

"synonymous" with "relating to." *Miller*, 976 F.3d at 1030 (citing *Cal. Tow Truck Ass'n v. City & Cnty. of San Francisco*, 807 F.3d 1008, 1021 (9th Cir. 2015)). We read the Supreme Court's decision in *Dan's City Used Cars* to say that "with respect to" more narrowly means "concerns." See 569 U.S. at 261. Given Congress's choice in § 14501(c)(1) to use "relating to," its use of "with respect to" in § 14501(c)(2)(A) implies a different scope. No doubt "with respect to" is broad, but we decline to equate it to "relating to." Our different view of this phrase offers another reason why our construction of the safety exception is narrower than the Ninth Circuit's.

*        *        *

In the end, the plain text and statutory scheme indicate that 49 U.S.C. § 14501(c)(1) bars Ye's negligent hiring claim against GlobalTranz and that the Act's safety exception in § 14501(c)(2)(A) does not save it from preemption.

For these reasons, we AFFIRM.