In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 24-1192

SHAWN MONTGOMERY,

*Plaintiff-Appellant,*

*v.*

CARIBE TRANSPORT II, LLC, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Illinois
No. 19-cv-1300-SMY — **Staci M. Yandle**, *Judge.*

_____

ARGUED OCTOBER 30, 2024 — DECIDED JANUARY 3, 2025

_____

Before SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Shawn Montgomery was severely injured when his truck was hit by a tractor-trailer on the shoulder of an Illinois highway. Montgomery sued the driver, along with the carrier and freight broker that arranged delivery of the shipment. Montgomery claimed that the freight broker, C.H. Robinson Worldwide, Inc., had negligently hired the driver and carrier and was also vicariously liable for their torts. The district court concluded that Robinson was not

vicariously liable and granted partial summary judgment in its favor. The court later entered judgment for Robinson on the negligent hiring claims based on our decision in *Ye v. GlobalTranz Enterprises, Inc.*, 74 F.4th 453 (7th Cir. 2023). Because the driver and carrier were Robinson's independent contractors, and *Ye* bars Montgomery's negligent hiring claims, we affirm.

I

Yosniel Varela-Mojena was hauling a load of plastic pots through Illinois when he veered off the road and into Shawn Montgomery's tractor-trailer where it was stopped on the side of the road, injuring Montgomery. Varela-Mojena was driving for his employer, motor carrier Caribe Transport II, LLC, at the time of the accident.[*] The shipment had been coordinated by C.H. Robinson Worldwide, Inc. Robinson is a freight broker, meaning it arranges for transportation between motor carriers such as Caribe and shippers of goods. Robinson had brokered this shipment, like many others, pursuant to a standing Broker/Carrier Agreement with Caribe. This nonexclusive agreement provided that Caribe was Robinson's independent contractor and retained exclusive control over the manner of performance of transportation services, as well as the equipment and personnel it used to perform them.

Montgomery sued Varela-Mojena and Caribe in federal court under diversity jurisdiction for the injuries he sustained from the collision. Montgomery also sued Robinson (and several of its sister companies, all of which we refer to as

---

[*] Montgomery sued both Caribe Transport II, LLC and Caribe Transport, LLC. The distinction between these entities is not significant for this appeal, so we collectively refer to both as Caribe.

Robinson). He alleged that Robinson negligently hired Varela-Mojena and Caribe and was vicariously liable for their torts. Robinson moved for summary judgment on the vicarious liability claim, which the district court granted after finding that Varela-Mojena and Caribe were Robinson's independent contractors, not its agents. Shortly after, we issued our decision in *Ye v. GlobalTranz Enterprises, Inc.*, 74 F.4th 453 (7th Cir. 2023). There, we held that the preemption provision of the Federal Aviation Administration Authorization Act (FAAAA), 49 U.S.C. § 14501(c)(1), bars state law claims against freight brokers for the negligent hiring of motor carriers and their drivers. *Id.* at 464–66. Citing *Ye*, the district court granted judgment for Robinson on the negligent hiring claims. The district court then entered final judgment in favor of Robinson on the vicarious liability claim to facilitate Montgomery's appeal. This appeal followed, while Montgomery's claims against Varela-Mojena and Caribe are stayed in the district court pending its resolution.

II

On appeal, Montgomery argues that several aspects of Caribe's relationship with Robinson support finding an agency relationship. Conceding that *Ye* forecloses his negligent hiring claims, Montgomery also asks us to overrule *Ye* and reinstate them. Our review is de novo. *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) (summary judgment); *Hanover Ins. v. R.W. Dunteman Co.*, 51 F.4th 779, 785 (7th Cir. 2022) (judgment on the pleadings). Because his vicarious liability claim was resolved on summary judgment, we view the facts in the light most favorable to Montgomery and draw all reasonable inferences regarding the agency relationship in his favor. *Miller*, 20 F.4th at 1155. Regarding

judgment on Montgomery's negligent hiring claims, we ask whether the well-pleaded factual allegations viewed in his favor state a facially plausible claim for relief. *Hanover Ins.*, 51 F.4th at 785.

A

We turn first to the vicarious liability claim. In Illinois, a "principal is vicariously liable for the conduct of its agent but not for the conduct of an independent contractor." *Sperl v. C.H. Robinson Worldwide, Inc.*, 946 N.E.2d 463, 470 (Ill. App. Ct. 2011). With respect to the broker/carrier relationship, "courts applying Illinois law consistently have declined to find an agency relationship when a company hires an independent driver to deliver a load to designated persons at designated times but does not reserve the right to control the manner of delivery." *Cornejo v. Dakota Lines, Inc.*, 229 N.E.3d 546, 556 (Ill. App. Ct. 2023); accord *Kolchinsky v. W. Dairy Transp., LLC*, 949 F.3d 1010, 1014 (7th Cir. 2020). Instead, courts typically find that the motor carrier and driver are merely the freight broker's independent contractors. See *Cornejo*, 229 N.E.3d at 556–58.

When determining whether the broker/carrier relationship has stepped outside this norm, the "cardinal consideration" is whether the broker retained the right to control the manner of delivery, rather than its "mere result." *Id.* at 553. Other factors include the right to make hiring decisions, the right to discharge or otherwise terminate the relationship, the method of payment and whether taxes are deducted, the provision of equipment, the level of skill required, and the relative nature of the work and supervision between the parties. *Id.*; *Sperl*, 946 N.E.2d at 1058. The labels the parties assign themselves in a written agreement do not decide their agency

status, though they "cannot be ignored." *Cornejo*, 229 N.E.3d at 555.

According to Montgomery, there are significant indicators that Caribe and Robinson deviated from the typical broker/carrier relationship such that Robinson was not just assigning transportation but controlling the performance of the transportation services. We agree with the district court that, as a matter of law, none establish an agency relationship.

First, Montgomery says Robinson controlled communications with the shipper and recipient of the loads and arranged all pickup and delivery times. In his view, this equates Robinson to a dispatcher controlling all matters leading up to and during the delivery. Illinois courts, however, have held that these delivery instructions pertain to "ancillary aspects of the transportation itself" and are merely specifications of "the particular hauling task." *Id.* at 557, 559. They do nothing to control how the job is done and therefore fail to demonstrate agency. *Id.* Montgomery also points to status updates that Robinson expected from Caribe and Varela-Mojena during a delivery. These were typical status calls required by every broker; Robinson did not give instructions or directions during them. Montgomery emphasizes, however, that Robinson had drivers enable a program called MacroPoint on their cell phones while hauling a load and that this gave Robinson additional control over the deliveries. But the record makes clear that MacroPoint is a passive tracking technology without two-way communication, not a platform for Robinson to provide instructions or directives to drivers. Contrary to Montgomery's argument, a broker does not dictate how a driver performs a delivery when it uses software applications or check-in calls to monitor its status. *Id.* at 554, 559.

Montgomery presses on, saying that Caribe was required to provide Robinson with information about who was hauling a load, their hours of service, and the location of trucks. But this argument highlights a lack of control: Caribe, not Robinson, assigned drivers and set their hours of service. Cf. *Kolchinsky*, 949 F.3d at 1012. Robinson needed this information to estimate a load's delivery time and coordinate its delivery, not to exercise control. Although Robinson could request that a different driver transport a load, this is not evidence that Robinson controlled how the load was hauled. *Cornejo*, 229 N.E.3d at 555.

Next, Montgomery points to language in the load confirmation that the rate was "contingent upon successful and on-time completion" and that anything short of this could "jeopardize … future business opportunities" with Robinson. He equates this to *Sperl v. C.H. Robinson Worldwide, Inc.*, where the broker (also Robinson) had imposed such an impossible fine-enforced schedule on the driver that she was forced to violate federal hours-of-service regulations to deliver the load on time and avoid fines. 946 N.E.2d at 469, 472. The court viewed this fine system as one way Robinson could control the entire transportation process. *Id.* at 472. By contrast, there was no testimony by Varela-Mojena that he knew of any fine system or that the threat of a fee reduction influenced his driving. The so-called fines available to Robinson here are standard rate adjustments, which pertain to billing for transportation services and do not control the transportation itself. *Cornejo*, 229 N.E.3d at 554, 559 (fees for late or damaged goods are ancillary aspects of the transportation and do not establish an agency relationship). The fact that Robinson tracked the percentage of Caribe's on-time deliveries and assigned it a performance score also fails to establish agency. *Id.* at 559

("Evidence regarding performance metrics scoring delivery drivers has also been rejected as legally insufficient to establish agency."). It is immaterial that Robinson could choose not to use Caribe in the future. *Id.* at 554, 559 (performance scores that could jeopardize future freight orders do not show the requisite degree of control over the work performed).

Furthermore, Robinson did not provide any equipment to Caribe or Varela-Mojena and did not pay for maintenance or related expenses. While a fuel surcharge was included in the rate Robinson paid, this is not the provision of equipment Montgomery makes it out to be. See *id.* at 559 ("[F]uel surcharges relate to billing for transportation services and do not dictate control over the transportation itself."). Though the load confirmation specified what equipment the customer required for the delivery and could include other basic instructions, these generalized instructions only served to specify the contours of the hauling task, not to control the manner in which it was accomplished. See *id.* at 550–51, 557–58. Montgomery compares simple instructions Robinson gave Caribe in prior, unrelated loads (for instance, that the driver had to re-stack tipped product or keep the inside of the trailer a certain temperature) to *Sperl*. But Robinson also owned the shipment in *Sperl*, and in its capacity as owner required the driver to continuously measure the internal temperature of the product itself to ensure it maintained its prescribed temperature range. 946 N.E.2d at 468, 471. *Sperl* thus involved a far more domineering dynamic than these previous loads. Regardless, any agency relationship Robinson might have had with Caribe during a prior delivery is irrelevant. Our inquiry is whether Robinson controlled the subject load at the time of the accident. *Brettman v. M & G Truck Brokerage, Inc.*, 127 N.E.3d 880, 887 (Ill. App. Ct. 2019) (agency relationship must

exist at the time negligence occurs, even if one existed previously). For this same reason, Montgomery's undeveloped argument that Robinson was more involved than Caribe after the crash is immaterial to its control during the accident. And frankly, any independent arrangements Robinson may have made regarding the cargo after the accident say nothing about Robinson's control over Caribe or Varela-Mojena.

The remaining facts Montgomery marshals do not support finding an agency relationship. That the bills of lading listed Robinson, not Caribe, as the carrier might help Montgomery in an apparent agency claim, see *Kolchinsky*, 949 F.3d at 1014–15, but it says nothing about Robinson's control over the delivery. As Robinson explained, many shippers create the bills of lading before a carrier is assigned, so they list the broker for convenience. Montgomery also argues that the job description of a Robinson carrier account manager is proof that Robinson controlled carriers such as Caribe. However, corporate jargon about "impactful capacity solutions" and "operational execution" is irrelevant to establishing an agency relationship between Robinson and Caribe. Last, the opinion of Montgomery's trucking expert, Dr. Thomas Corsi, that Robinson exerted extensive control over Caribe's operations is similarly unhelpful. Dr. Corsi's expert report just relays the same facts which we have already concluded do not establish an agency relationship. Cf. *Cornejo*, 229 N.E.3d at 556.

At best, any requirements Robinson imposed demonstrate control over the result of the work performed or matters ancillary to it. Cf. *id.* Robinson exercised little, if any, control over Caribe and its drivers. Robinson did not provide or maintain their equipment. It did not choose the driver, route, hours of service, or locations of rest and fuel stops, including

for the subject load. Varela-Mojena drove under Caribe's insurance at all times. Robinson did not make hiring or firing decisions for Caribe. Robinson did not pay drivers or even Caribe directly for the loads, and did not withhold taxes or benefits from these payments. Either party could terminate the relationship at any time. Robinson did not provide drivers with any training, instruction manuals, or uniforms. And, importantly, Caribe was prohibited from subcontracting or delegating work given to it by Robinson or otherwise contracting on its behalf. Courts decline to find an agency relationship under these circumstances. *Id.* at 550, 554–55, 559–60; *Kolchinsky*, 949 F.3d at 1012–14.

Finally, Robinson and Caribe adhered to their Broker/Carrier Agreement, which specified that Caribe was to be Robinson's independent contractor, not agent. These labels "cannot be ignored." *Cornejo*, 229 N.E.3d at 555. Ultimately, the undisputed evidence shows that Caribe and Varela-Mojena were not Robinson's agents and vicarious liability does not attach. Summary judgment was proper.

## B

As to his negligent hiring claims, Montgomery asks us to reconsider our court's decision in *Ye v. GlobalTranz Enterprises, Inc.* In *Ye*, we determined that the FAAAA preempts state law claims that a freight broker negligently hired a motor carrier. 74 F.4th at 466. Montgomery's only argument on appeal is that *Ye* was wrongly decided and should be overturned, which would permit his negligent hiring claims to move forward. "'We do not take lightly suggestions to overrule circuit precedent,' and therefore 'require a compelling reason to do so.'" *Int'l Union of Operating Eng'rs Loc. 139 v. Schimel*, 863 F.3d 674, 677 (7th Cir. 2017) (quotations omitted). Montgomery

points only to pre-*Ye* or out-of-circuit decisions and a statement by the Solicitor General for support. These are not compelling reasons to revisit a case we decided only one year ago. *Santos v. United States*, 461 F.3d 886, 893 (7th Cir. 2006) ("[S]imply showing that a point is debatable is not enough to meet the compelling-reasons standard for overturning circuit precedent."). We decline to overrule *Ye*, though Montgomery's argument is preserved for further review should he seek it.

AFFIRMED